422 So.2d 1270 (1982)
ARTHUR DOOLEY & SON OF LOUISIANA, INC.
v.
Maurice JOHNSON, et al.
No. 5-78.
Court of Appeal of Louisiana, Fifth Circuit.
October 12, 1982.
Rehearing Denied December 17, 1982.
*1271 H. Bruce Shreves, Simon, Peragine, Smith & Redfearn, New Orleans, for Nat. Sur. Corp., intervenor-appellee.
C. Ellis Henican, Jr. and Robert Angelle, Henican, James & Cleveland, New Orleans, for Arthur Dooley & Son of Louisiana, Inc., plaintiff-appellee.
Thomas G. Donelon, Donelon, Canella & Donelon, Metairie, and Eugene R. Preaus, Virginia N. Roddy, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for William T. Quirk & Jefferson Bank & Trust Co., defendants-appellants.
Before BOUTALL, KLIEBERT and CURRAULT, JJ.
BOUTALL, Judge.
This is a suit in tort against a bank for cashing checks of the plaintiff corporation made out to one of its subcontractors. The subcontracting company was secretly operated by one of the plaintiff's own employees, as part of a scheme to embezzle or improperly obtain money from his employer. The negligence for which the bank is alleged to be liable to the plaintiff is that the bank, when cashing the checks, allowed the employee-subcontractor to endorse them in the name of his business only, without adding his personal endorsement. The plaintiff corporation contends had the employee's name been added below that of the payee subcontractor, plaintiff would have discovered the scheme immediately *1272 and thus avoided the substantial monetary losses it suffered as a result of its employee's fraud.
The trial court denied the bank's exceptions of no cause of action, no right of action and prescription. Following trial on the merits before a jury, a verdict was rendered in favor of the plaintiff in the amount of $194,000. The bank appealed. We reverse, finding the verdict below was predicated on an error of law.
Arthur Dooley & Son of Louisiana, Inc., plaintiff herein, is a Texas-based company which sells and installs firefighting equipment. In 1973, Dooley hired Maurice J. Johnson to be manager of its office in Harvey, Louisiana. A condition of his employment was that he not engage in outside employment or other business activities without prior consent of the company. Johnson was in charge of selling equipment, engaging subcontractors, inspecting, supervising, and hiring workers. He had no right to disburse money directly, but was authorized to approve payment of invoices of Dooley's subcontractors. It was his practice to initial the invoices, which were then forwarded to the Beaumont, Texas home office of his employer for payment. There, Dooley employees would match up the invoice with the appropriate jobs, and then make out a check to the subcontractor which would be mailed from the Beaumont office.
In the summer of 1974, Dooley contracted with Marathon Oil Company to install and refurbish firefighting equipment on some of Marathon's offshore drilling platforms. Dooley decided to subcontract out the welding for the work to be handled by the Harvey office.
The welding subcontractor engaged by its Harvey manager, Maurice Johnson, was Offshore Welders and Fabricators (OW & F). Unknown to Dooley, OW & F was a sole proprietorship set up by Johnson, presumably to skim off money from the welding subcontract. Apparently Johnson's scheme was to hire other companies to do only enough of OW & F's work to avoid suspicion; he would then send invoices, approved by himself as Dooley's manager, to Dooley as if OW & F had performed all the work for which it was hired. When Dooley paid the invoices, Johnson would pay OW & F's subcontractors, retaining the overage for himself. From September 24, 1974 to October 3, 1975, Dooley made 30 checks, totalling $240,983.44, payable to the order of Offshore Welders & Fabricators. From all that could be established at trial, it is likely he used this money to support a serious gambling habit.
Jefferson Bank & Trust Company (JB & T) and William T. Quirk, the JB & T Harvey branch manager, defendants-appellants herein, became unwittingly involved in Johnson's scheme. Johnson and Quirk belonged to the same country club, and Johnson had an affable and engaging personality. Johnson made overtures to Quirk to establish a business relationship with the bank. The bank investigated his employer, Dooley, and learned Dooley was a well-established company with an excellent credit rating. Hoping to get some of Dooley's business through Johnson, the bank was accommodating to Johnson. Johnson opened up an account in the name of Gulf Offshore Services, Inc., (apparently another dummy company he owned) and also took out a personal loan.
In addition, as Dooley began issuing checks to OW & F for the work supposedly done, Johnson brought the checks to JB & T for negotiation. All but one of the 30 checks were negotiated at JB & T, and the majority of them were approved by Quirk for processing. Twenty-three of the checks were endorsed "Offshore Welders & Fabs" or "Offshore Welders & Fabricators;" six others were endorsed the same way, with the additional endorsement "T.D." or "T. Doyle" or "Tom Doyle." Six of the checks were deposited in the account of Gulf Offshore; the remaining checks were cashed by Johnson. The average amount of the checks was in excess of $8,000. Some of them exceeded $10,000, and two or three were in excess of $20,000. There is no proof that either Quirk or JB & T had actual knowledge of Johnson's scheme.
*1273 From September 1974 until November 1975, no inquiry about the checks was made either by the drawee bank, First Security State Bank in Beaumont, Texas, or by the drawer, Dooley. None of the checks were returned or dishonored. In October 1975, however, Dooley was alerted to Johnson's connection with OW & F when a company hired by Johnson to perform some of OW & F's work contacted Dooley for payment. Subsequent investigation revealed Johnson's dealings, and an inventory showed Dooley had been charged and had paid for supplies, equipment and services it never received.
At Dooley's request, the 29 checks to OW & F were returned thereafter by First Security State Bank to JB & T for the personal endorsement of Johnson. JB & T contacted Johnson and he willingly signed his name as proprietor on each check under the OW & F endorsement. The checks were then returned to First Security Bank and then to Dooley.
In May 1976, Dooley filed a lawsuit against Johnson for breach of fiduciary relationship, alleging Johnson had violated his fiduciary trust with Dooley and had unjustly enriched himself in the amount of $293,900.09, which amount was prayed as damages. Johnson filed a general denial in proper person, and then seems to have absconded, for he made no further appearance in the proceedings or at trial.
In June 1977, Dooley filed an amended petition naming JB & T as a defendant, alleging the bank was liable in solido with Johnson. Dooley alleged the bank's failure to require "complete and proper endorsement by the payee" aided Johnson "in perpetrating his fraudulent and illegal scheme." Dooley later added Quirk and the Continental Insurance Company as defendants; Continental was dismissed from the suit on summary judgment before trial.
As mentioned earlier, the case was tried to a jury. Their verdict in favor of Dooley was rendered pursuant to interrogatories basing liability on negligence and proximate cause.[1]
The threshold question, aptly stated by plaintiff-appellee Dooley in brief, is the nature of the duty owed by JB & T to a non-customer such as Dooley whose checks were negotiated initially at that bank. Dooley, interpolating Louisiana's commercial laws and general negligence law, asserts a bank must act in good faith and with ordinary care, according to reasonable commercial standards. Dooley maintains the bank's failure to require Johnson's personal endorsement constituted bad faith under the circumstances, violated reasonable commercial standards, and was a failure to use ordinary care. Dooley argues that the circumstances of the case at bar presented the bank with abundant irregularities which should have aroused the suspicions of someone at the bank, yet the bank took no precautions against the operation of a fraud and made no inquiries to anyone except Mr. Johnson himself. Additionally it contends that if the bank had availed itself of the procedure of requiring Johnson to sign the back of each check with the endorsement "By Maurice Johnson," or "Maurice Johnson, Proprietor," below the endorsement of the payee, then Dooley would have been able to discover the fraud perpetrated upon it by Johnson.
The appellants, JB & T and Quirk, contend they acted properly in negotiating the checks, which were unaltered, drawn to the order of Offshore Welders & Fabricators and endorsed in the name of the payee by the sole proprietor of the payee. They note that the bank was presented an instrument which, on its face, met all statutory requirements of negotiability. It had no notice of any defenses available thereto and therefore, the payment was proper. Appellants argue that, in the absence of a forged endorsement, conversion, acceptance of a check endorsed by an agent acting without *1274 authority for his principal, or breach of warranty, the bank owed no other duty to the drawer. Under La.R.S. 10:4-207 it warranted to any payor, including the drawer, Dooley, that it had good title, no knowledge that the signature of the drawer was unauthorized and that the item had not been materially altered. None of these warranties was breached.
Louisiana's commercial laws are contained in Revised Statutes 10, Chapters, 1, 3 & 4. The legislature's enactment of these articles of the Uniform Commercial Code embodies a unified scheme designed to govern commercial transactions. LSA-R.S. 10:1-102, 1-104. The other laws of Louisiana apply only where a situation is not covered by the commercial laws. LSA-R.S. 10:1-103. The duties of a bank in handling commercial paper are prescribed in Chapters 3 & 4 of R.S. 10.
Johnson indisputably was doing business as Offshore Welders & Fabricators. It was a sole proprietorship and therefore he was entitled to endorse checks in Offshore's name. LSA-R.S. 10:3-401, 10:3-402, 10:3-403. The law does not oblige him to add his own name unless it is required by the person cashing the check.
"Where an instrument is made payable to a person under a misspelled name or one other than his own he may endorse in that name or his own or both; but signature in both names may be required by a person paying or giving value for the instrument." (Emphasis added.) LSA-R.S. 10:3-203.
There is no provision requiring the bank to insist he add his name to that of his company. LSA-R.S. 10:4-205 allows a depositary bank to supply any endorsement of the customer which is necessary to title. No other endorsement was required in this case, however, because the check was made out to and cashed by the named payee.
LSA-R.S. 10:3-207 provides that negotiation is effective to transfer the instrument, but may be rescinded except as against a subsequent holder in due course. Holder in due course is defined in LSA-R.S. 10:3-302(1):
"A holder in due course is a holder who takes the instrument
(a) for value; and
(b) in good faith; and
(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.
* * *"
There is no dispute that the bank took the checks for value. Our brothers on the First Circuit have recently analyzed how good faith and notice are to be interpreted for holder-in-due-course status under Louisiana law. We adopt their cogent explanation:
"The NIL has been partially replaced by the provisions of the Uniform Commercial Code adopted by Louisiana and we have had no cases on this point. However, other jurisdictions have interpreted the UCC to say that mere negligence or failure to make inquiries which a reasonable man would make, does not amount to bad faith so long as the party does not refuse to inquire in order to remain ignorant of facts which he fears would disclose a defect in the transaction. [Citation omitted.] Though a holder may have been negligent in taking the paper and omitted precautions which a prudent man would take, unless he has acted male fide his title will prevail. [Citations omitted.]
"We believe our statutory provisions lead to the same conclusions. The current UCC provisions are more specific in the requirements of holder in due course status than the former NIL. A holder in due course must take possession of a note in good faith, for value, and without notice of any defense or claim to it on the part of any person. La.R.S. 10:3-302. A purchaser has notice of a claim or defense if he has notice that the obligation of any party is voidable in whole or in part. La.R.S. 10:33-304(1)(b). Notice of a fact is defined as actual knowledge, receipt of notice or notification of the fact, or from all facts and circumstances known to a *1275 person at the time in question, he has reason to know that the fact exists. La. R.S. 10:1-201. A person knows or has knowledge of a fact when he has actual knowledge of it. La.R.S. 10:1-201.
"Good faith is defined as honesty in fact in the conduct or transaction concerned. La R.S. 10:1-201. * * *
"The `reasonable man test' is not the standard to be applied in determining notice of a defense or good faith. Both determinations require a more subjective test, with the determination of good faith being totally subjective. [Citation omitted.] The `reason to know' portion of the notice requirement guards against an intentional or wilful ignorance." Republic of Texas Savings Association v. First Republic Life Insurance Company, 417 So.2d 1251 (La.App. 1st Cir.1982).
Applying that reasoning here, we conclude the record shows nothing to indicate Quirk or JB & T "refused" to inquire for fear of defects in the transaction.
The circumstances Dooley says should have made Quirk and the bank suspicious of Johnson's business activities are the following: (1) that Johnson was a former bankrupt who liked to gamble; (2) that Johnson was a Dooley employee, yet he was cashing his employer's checks payable to a third party; (3) that he was cashing checks for large denominations, or depositing such checks, payable to Offshore Welders & Fabricators, in the account of Gulf Offshore Services, Inc.; (4) that Johnson repeated this procedure many times; (5) that Offshore Welders & Fabricators did not have an account with the bank; and (6) that Johnson was the proprietor of Offshore Welders & Fabricators.
None of these circumstances, nor even all of them together, gave JB & T "reason to know" that Johnson was cheating his employer. Even the Uniform Fiduciaries Law, LSA-R.S. 9:3801 et seq., does not impose as severe a burden on a bank as Dooley would require. Although the U.F.L. is not applicable to this case, since Johnson was not dealing with JB & T as a fiduciary for Dooley, we note the U.F.L. does not hold a bank liable unless the bank has actual knowledge that the fiduciary is committing a breach of his fiduciary obligation, or unless the bank has knowledge of such facts that its action amounts to bad faith. LSA-R.S. 9:3804, 3806, 3807, 3809. In fact, the U.F.L. repudiates the negligence test by its definition of good faith. LSA-R.S. 9:3801(5), and "Comments" thereunder.
Indeed, under LSA-R.S. 10:3-304(4)(e), knowledge that a person negotiating the instrument is or was a fiduciary does not of itself give the purchaser notice of a defense or claim.
Dooley also alludes to the rule that as between two innocent parties, the one who made possible a breach of trust by his act of confidence must bear the loss. We believe this rule applicable, but against Dooley rather than the bank. After all, Johnson was Dooley's own employee. Yet Dooley would have it that the bank is required to take note of Johnson's lifestyle, financial background, and personal background, while Dooley need not do so. This is an unfair burden to impose on the bank in these circumstances.
Considering all the above, we conclude JB & T took the checks in good faith and without notice of Dooley's defenses against it. As a holder in due course, therefore, JB & T is immune to recourse by Dooley.
Finally we address the question of Quirk's personal liability. A determination of negligence involves a two-step process. First, it must be determined whether Quirk's conduct was a cause-in-fact of the harm suffered by Dooley. Secondly, if his conduct was a cause-in-fact, were his acts a breach of a duty imposed to protect Dooley against the particular risk it encountered? Knockum v. Amoco Oil Co., 402 So.2d 90 (La.App. 1st Cir.1981).
Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm; that is, if the harm would not have occurred without it. Dixie Drive it Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). A defendant's conduct *1276 must be a necessary antecedent of plaintiff's harm but it need not be the sole cause contributing to the harm; if the plaintiff can show that he probably would not have suffered injury absent defendant's conduct, he has carried his burden of proof relative to cause in fact. Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La.1977).
Anthony Onofrio, Dooley's company comptroller, testified he was in charge of all accounting functions. He stated he and the company bookkeeper reviewed cancelled checks and reconciled the bank statements on a monthly basis. It was the bookkeeper's responsibility to examine the bank checks for endorsements. She was deceased by the time of trial; Onofrio said, however, that she was meticulous and did an excellent job.
Although these statements do not prove that Dooley's accounting department would have noticed Johnson's endorsement if Quirk had required him to add it, we cannot say it is unlikely they would have seen it. Further, considering Onofrio's alertness in ferreting out the scheme when tipped off by an inquiry from Johnson's subcontractor, it is probable his department would have traced Johnson's signature if they had noticed it on the Offshore Welders checks. We conclude, then, that Quirk's failure to require Johnson's personal endorsement was a cause in fact of the harm to Dooley.
The next question is whether Quirk's conduct violated a duty to Dooley. As a bank officer, the standards of care he was to follow would necessarily be those imposed on the bank by statute. Those statutes are discussed above. Violations of statutorily-imposed duties do not automatically create liability in a particular civil case, however, for the duty may have been designed to protect someone other than the plaintiff or to protect the plaintiff from some evil other than the injury for which it seeks recovery. Knockum v. Amoco Oil Co., supra.
We find the latter to be applicable here. There is no statutory requirement for the personal endorsement of one operating under a trade name. Dooley, citing the testimony of its expert, contends nevertheless that Quirk failed to follow good banking practice and did not exercise ordinary care by approving the checks for cashing absent Johnson's personal endorsement. Even if that is the case, however, any duty to require a personal endorsement is designed to protect the drawer or maker of a check from forgery, imposter, or some other more direct misuse of commercial paper.
The injury of which Dooley complains, reduced to its essence, is that it paid for services and supplies it did not receive. (The corollary, that its fiduciary profited at its expense, can be urged only against that Fiduciary.) Any duty on the part of Quirk lay in insuring that Dooley's checks were cashed by the payee or its agent and that the checks were not materially altered. He had no obligation to serve as a detective for Dooley to ferret out arcane methods of pilfering by Dooley's employees. We conclude, accordingly, that Quirk is not liable to Dooley for its losses.
Considering the foregoing, the judgment of the district court is reversed and it is ordered that there be judgment herein in favor of defendants, William T. Quirk and Jefferson Bank & Trust Company, dismissing the demand of plaintiff, Arthur Dooley & Son of Louisiana, Inc. All costs are to be paid by plaintiff.
REVERSED & RENDERED.
NOTES
[1] National Surety Corporation, which was the surety for Johnson with Dooley, had intervened in the suit to recover $5,000 it had paid to Dooley on the surety bond. The judgment rendered in conformity to the jury verdict apportioned the award correspondingly. Hence National Surety Corporation is also an appellee before this Court.