**SCHWEGMANN BANK & TRUST COMPANY OF JEFFERSON,**
Plaintiff–Appellee,

v.

**Cecil R. SIMMONS,**
Defendant–Appellant.

No. 88–4674.

United States Court of Appeals,
Fifth Circuit.

Aug. 17, 1989.
Rehearing Denied Sept. 18, 1989.

Chris Boswell, Harlingen, Tex., for defendant-appellant.

James R. Madison, Jeffrey W. Weiss, Wiener, Weiss, Madison & Howell, Shreveport, La., for plaintiff-appellee.

Before GEE, GARZA, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Dr. Cecil R. Simmons contests on several grounds the trial court's entry of summary judgment, holding him liable for his promissory note in the face amount of $117,864, together with interest, attorneys fees and costs. Finding no reversible error in the trial court's decision, we affirm.

## BACKGROUND

Dr. Simmons was persuaded to enter into a limited partnership whose purpose was the purchase of investment real estate located in Tarrant County, Texas. The promoters of this limited partnership and numerous similar ventures were headquartered in Louisiana. On July 31, 1985, Simmons's participation in the venture was memorialized by a subscription agreement in the East Pointe Land Partners 1985 Limited Partnership; a promissory note payable to Q–L Investments, Inc., the general partner in East Pointe; and a security agreement pledging to Q–L Simmons's partnership unit. Q–L endorsed Simmons's note to its related company Quinn–L Capital Corporation. Quinn–L next endorsed Simmons's note to the Bank of Commerce of Shreveport, Louisiana (BOC), as security for a loan from the Bank of Commerce to Quinn–L.

For present purposes, it need only be added that BOC had agreed to furnish a $4 million line of credit in favor of Quinn–L and related companies and sought out participant banks in the line of credit because it had reached its legal lending limit for those entities. On September 11, 1985, Schwegmann Bank and Trust Company of Jefferson, Louisiana, agreed to a $1 million participation. BOC continued to hold the Quinn–L note and limited partner investor notes for two limited partnerships which secured that note. BOC was the "lead" bank and trustee for Schwegmann, the participant, funding bank. When BOC shortly afterward experienced severe financial difficulties, threatening its existence, Schweg-

mann determined to take over the Quinn–L note and the investor notes securing it. This was accomplished April 1, 1986, by endorsement of Simmons's note and the other documents to the order of Schwegmann, without recourse except as to one investor's $62,000 note. Schwegmann expressly reserved all claims against BOC and paid no consideration for the endorsement. Two weeks later, Quinn–L filed for bankruptcy. In mid-June, FDIC closed BOC and placed it in receivership.

Schwegmann began corresponding with Simmons to advise him of his responsibility to direct payments to Schwegmann rather than Quinn–L. Although Simmons initially decided that he did not want to be associated with Quinn–L's bankruptcy and attempted to relinquish his partnership interest, he later changed his mind and continued making interest payments on the note until April 1987.

## DISCUSSION

### I. PERSONAL JURISDICTION

■ Among the numerous issues raised by Dr. Simmons on appeal, the first we must address is that of personal jurisdiction. Simmons contends that the choice-of-forum clause in his security agreement with Q–L is unenforceable and that the district court in the Western District of Louisiana had no personal jurisdiction over him. The latter issue is controlling, because personal jurisdiction is required even if the choice of forum clause were unenforceable.

The district court found that Simmons had purposefully availed himself of the benefits of transacting business in Louisiana and that it would be neither unfair nor unreasonable to require him to litigate in Louisiana. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Its conclusion is amply supported by the following facts. The partnership in which Simmons invested had as its general partner a corporation (Q–L) whose principal office was located in Shreveport, Louisiana. Simmons delivered his subscription agreement to the Louisi-

ana general partner for East Pointe in Shreveport and gave Q–L his irrevocable power of attorney. The promissory note Simmons executed provides that it is governed in all respects by Louisiana law. Finally, all principal and interest payments on the note were to be made to Q–L in Shreveport, Louisiana. Simmons knew his note would be used as collateral for financing the partnership and thus could have foreseen that the note would be negotiated to a Louisiana entity. The district court also concluded that requiring Simmons, although a resident of South Texas, to defend a lawsuit in Shreveport, Louisiana was neither unreasonable nor unjust. We concur with that assessment on the facts before us.

The trial court's personal jurisdiction over Simmons cannot seriously be challenged.

### II. ABSTENTION

■ Simmons next contends that the district court should have abstained from hearing this case because he filed a lawsuit one month earlier in Texas state court, alleging that the Simmons note was void and unenforceable. The district court declined to abstain, and in so doing did not abuse its discretion. A federal court should abstain only in exceptional circumstances. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

Simmons's reliance on *Ingersoll–Rand Financial Corp. v. Callison,* 844 F.2d 133 (3d Cir.1988), to support his abstention argument is misplaced. The Third Circuit found that a district court had properly abstained from hearing a collection case filed by Ingersoll–Rand against investors in a limited partnership because to do otherwise would thwart the investors' choice of a state law forum for litigating securities *suits they had already filed* against Ingersoll–Rand. The court held that a plaintiff is entitled to his choice of a state or federal forum under the Federal Securities Act of 1933. *Id.* at 137. In this case, by contrast, Simmons had not joined in his Texas state suit a claim under the federal

securities laws until more than six months after Schwegmann's complaint was filed in federal district court. Moreover, Simmons first alleged violations of the Securities Act in his answer to Schwegmann's complaint. He simply did not choose to litigate his securities action either first or foremost in the pending Texas lawsuit.

## III. WHETHER SCHWEGMANN BANK IS A HOLDER IN DUE COURSE

Louisiana has adopted article three of the Uniform Commercial Code ("UCC") governing the rights of parties holding negotiable instruments. *See* La.Rev.Stat. §§ 10:3–101 to 10:3–806. We apply Louisiana law in this diversity case but we also look for guidance to other jurisdictions that have adopted the identical UCC sections. *See Bricks Unlimited, Inc. v. Agee,* 672 F.2d 1255, 1258 (5th Cir.1982) (holding that it was unnecessary to decide whether to apply Louisiana or Mississippi negotiable instrument law since both states had adopted the identical UCC provisions).

La.Rev.Stat. § 10:3–305 provides that a holder in due course takes the negotiable instrument free from all claims to it and all defenses except those enumerated in the section. Section 10:3–302 provides that:

> A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of a defense or claim to it on the part of any person.

It is undisputed that Schwegmann Bank is the legal holder of the Simmons note. However, Simmons contests the bank's good faith and lack of notice of his alleged defenses.

Schwegmann Bank responds that Simmons's pleadings are insufficient to estab-lish a defense on the note to withstand summary judgment. We do not need to adjudicate Simmons's defenses against Quinn–L if it sought to collect on the note, because the critical issue is whether Simmons has raised a material fact question regarding Schwegmann's good faith and notice of those defenses when it acquired the note.

In Louisiana, there is conflicting authority on whether "in good faith" and "notice [of] ... a defense" are to be determined on the basis of Schwegmann's subjective or objective knowledge and conduct. Schwegmann relies on two Louisiana appellate court cases which hold that the good faith inquiry is entirely subjective and that the notice of defenses inquiry is essentially subjective, *i.e.*, that the holder did not intentionally abstain from investigation to avoid notice of potential defenses. *Republic of Texas Savings Assoc. v. First Republic Life Insurance Co.,* 417 So.2d 1251, 1255 (La.App. 1st Cir.1982), *cert. denied,* 422 So.2d 161 (1982); *Arthur Dooley & Son of Louisiana, Inc. v. Johnson,* 422 So.2d 1270, 1274–75 (La.App. 5th Cir.1982), *writ denied,* 429 So.2d 152 (1983).

Simmons cites *Asian Int'l, Ltd. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 435 So.2d 1058, 1062 (La.App. 1st Cir. 1983) which holds that "[g]ood faith is determined on a reasonableness standard, in that the facts must be such as would necessarily put a reasonable person on inquiry to ascertain the true facts." This language in *Asian Int'l* creates an apparent ambiguity in Louisiana law concerning whether the test for good faith of a holder in due course is subjective or objective. We are persuaded, however, that *Asian Int'l* either used loose language or incorrectly interpreted Louisiana's UCC on this point.[1] Be-

---

**1.** Initially, the "reasonableness" test of good faith set forth in *Asian Int'l* is *dicta,* because the court notes that the only ground asserted by the note's maker to vitiate the holder's good faith—lack of authority for the corporate officers' signatures—was specifically precluded by another provision of the UCC. 435 So.2d at 1062.

Second, *Asian Int'l* was decided one year after *Republic of Texas* by the same intermediate Louisiana appellate court, and it fails to cite that case or *Arthur Dooley.* The case stands as isolated precedent.

Third, we note that La.Rev.Stat. § 10:1–201 defines good faith as "honesty in fact in the conduct or transaction concerned." That is not an objective standard, as *Republic of Texas* recognized. *Asian Int'l* does not explain what it means by the phrase "reasonableness standard"

cause *Republic of Texas* and *Arthur Dooley* seem to apply the current UCC definitions of good faith and notice more rigorously than *Asian Int'l*, we therefore adhere to our prior decision in *Bricks Unlimited*, which holds, consistently with these two cases, that the identical good faith provision of Louisiana and Mississippi law did not impose a duty of inquiry. 672 F.2d 1255, citing *General Investment Corp. v. Angelini*, 58 N.J. 396, 278 A.2d 193, 197 (1971) (no duty to inquire unless the circumstances reveal a deliberate desire "to evade knowledge because of a belief or fear that investigation would disclose a defense [or claim]").[2] Observing that a duty to make inquiry into all possible claims by a maker would create intolerable commercial burdens, *Bricks Unlimited* applied a subjective standard to the threshold issues of good faith and lack of notice. 672 F.2d at 1259. Thus, a duty of inquiry is implied only if the circumstances reveal a deliberate desire by the holder to evade knowledge of a claim by the maker. *Arthur Dooley*, 422 So.2d at 1275 (" 'The reason to know,' portion of the notice requirement guards against an intentional willful ignorance."); *Republic of Texas Savings Assoc.*, 417 So.2d at 1255 (same).

Turning to the merits, we begin with the findings of the district court based on uncontroverted summary judgment evidence:

[T]he Simmons note was not overdue and, thus, there could not have been notice to that effect, on April 1, 1986. It is undisputed that there was nothing on the face of the Simmons note to indicate a defense or claim of validity. Moreover, there was no information concerning the business practices of either BOC or Quinn–L to indicate that the Simmons note was subject to a defense. As indicated above, Sneed [Schwegmann's President] believed that the history of Quinn–L in repaying loans on a short term basis had been good.

Yet, Simmons alleges that Schwegmann knew certain facts which provided Schwegmann with notice of Simmons's three defenses to the note: failure of consideration; federal securities law violations; and fraud.[3] We disagree; the facts alleged could not alert Schwegmann to any such defenses nor do they create a material fact issue as to whether Schwegmann acted in bad faith.

The facts that Schwegmann was supposed to have known fall into one or more

---

except that it interprets good faith to include a limited duty to make reasonable inquiry. If "good faith" embodies this duty, however, it would clearly overlap with La.Rev.Stat. §§ 10:1–201, which establishes a holder's limited duty to inquire where "notice" of defenses is at issue. A person has notice of a fact if "he has actual knowledge of it," or if "he has received notice ... of it," or if the "facts and circumstances *known to him at the time in question*" provide *reason for him to know that it exists*. (emphasis added). The one case on which *Asian Int'l* relies for its interpretation of good faith is *Commercial National Bank in Shreveport v. Calk*, 207 So.2d 578 (La.App. 3d Cir.1968), decided under the Uniform Negotiable Instruments Law (NIL), predecessor to Article 3 of the UCC in Louisiana and elsewhere. The NIL's definition of a holder in due course arguably mingled the concepts of good faith and notice, for it defined notice of an infirmity in an instrument as "actual knowledge of the infirmity or defect, or knowledge of such facts that [the holder's] action in taking the instrument amounted to *bad faith*." La.Rev. Stat. § 7:56. (emphasis added). Whether the UCC substantively changed the definition of a holder in due course by disentangling good faith and notice is not at issue here. We may assume

the end results are consistent while observing that *Asian Int'l* erroneously relies on an overlapping of the terms good faith and notice that no longer exists in the statute.

2. *Bricks Unlimited* relied on the uniform case law rendered under the UCC. *Arthur Dooley*, 422 So.2d at 1275, and *Republic of Texas Savings Assoc.*, 417 So.2d at 1255, both state that "the determination of good faith [is] totally subjective." *Accord Bowling Green, Inc. v. State Street Bank and Trust Co.*, 425 F.2d 81, 85 (1st Cir. 1970) (interpreting Massachusetts law); *Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 56 (2d Cir.1982) (interpreting New York law); *Corporation Venezolana de Formento v. Vintero Sales Corp.*, 452 F.Supp. 1108, 1119 (S.D.N.Y.1978) (same). *See also* White and Summers, *Uniform Commercial Code* § 14–6 at 563 ("At the conclusion of the scrimmaging among the Code drafters and the various proponents of positions, it was clear that the draftsmen intended to adopt a subjective standard for the good faith test [regarding a holder in due course] in Article 3.").

3. The UCC requires notice of a defense that would render the note voidable in whole or in part. La.Rev.Stat. § 10:3–304(1)(b).

of three categories: (1) the fruition of a known investment risk; (2) contingencies contemplated and disclosed in the East Pointe Prospectus; or (3) evidence that Q–L or Quinn–L was in a poor economic condition. None of these facts, individually or together, raise an inference that Dr. Simmons was defrauded, that the securities laws had been violated, or that there had been a failure of consideration.[4] We shall discuss each fact in turn.

■ That the East Pointe limited partnership might never be fully subscribed was a known investment risk disclosed in the East Pointe Prospectus. The fact that it was not yet fully subscribed at the time Schwegmann Bank assumed the Simmons note, or that there were plans to refinance the East Pointe project, yields no notice of fraud and no defense to payment of the note. Schwegmann had no duty to inquire further into why this project was not yet fully subscribed.

■ Even assuming that the Quinn–L note and other Quinn–L loans funded by the Bank of Commerce were delinquent when Schwegmann purchased Simmons's note, that provides no notice of defenses Simmons may have had on his note. At most, that is some indication that Quinn–L may have been experiencing financial difficulties. As the district court stated, "[m]ere knowledge of poor financial health of the debtor does not preclude a subsequent debtor from obtaining holder in due course status." (citing *Michelin Tires v. First National Bank of Boston*, 666 F.2d 673, 682, 685 (1st Cir.1981); *Texico State Bank v. Hullinger*, 75 Ill.App.2d 212, 220 N.E.2d 248, 250 (4th Dist.1966)). The same analysis applies to the alleged fact that the Bank of Commerce president believed that "Quinn–L had not adequately responded to his inquiries regarding the use of the funds loaned under the Quinn–L note." Schwegmann Bank did investigate these matters, and Simmons does not dispute that Schwegmann was satisfied at the time it

acquired his note that most of the proceeds of the loan were on deposit at the Texas American Bank.

The fact that the note of one limited partner (Sirbasku) was delinquent in another limited partnership which jointly secured the Quinn–L note would not alert Schwegmann that Simmons had any defenses to his note for the East Pointe partnership.

The East Pointe Prospectus provided that outside financing might be required and that mortgages and liens might have to be granted in exchange for the outside financing. The East Pointe Prospectus also provided that entities related to Quinn–L had the right to borrow funds from the partnership. The fact that these contingencies came to pass does not indicate failure of consideration, securities law violation, or fraud.

Finally, Simmons alleges that Schwegmann knew that the Bank of Commerce had filed a $2.5 million suit against the Ricou–Brewster partnership run by the same promoters. This is, again, notice that another Quinn–L related company was having financial difficulty. The relationship, if any, to the Simmons note and any potential defenses to its payment is extremely tenuous and is not developed in the record by Simmons. If knowledge of Quinn–L's financial condition is insufficient to constitute actual knowledge of Simmons's claimed defenses, then knowledge of a related company's financial difficulty is equally insufficient.

Besides these facts, Simmons alleges that the Bank of Commerce President sent a letter to Schwegmann asserting that the Simmons note was not in default. Simmons claims that this is evidence of bad faith on the part of Schwegmann since the representations were drafted in large part by a Schwegmann attorney with the intention of whitewashing Simmons's defenses and creating a fraudulent impression of good faith. Yet, the letter only recites three uncontested representations, and the

---

**4.** Simmons also contends that Schwegmann's notice of defenses includes facts known to its "agent" BOC as a result of its particular agreement governing in the Quinn–L loan. Even if

this is true, and we do not decide the point, Simmons mentions no facts known exclusively by BOC that add to its charges detailed below.

only reference to the Simmons note is that none of "the notes serving as collateral for the [loan are] in default," with the exception of the Sirbasku note. That statement is true; its inclusion cannot serve as evidence of bad faith. The author of the letter is immaterial.

There is simply no evidence that Schwegmann acted in bad faith or had any notice of Simmons's claimed defenses. Schwegmann did investigate the use of funds advanced to Quinn–L, and there are no facts that should have led Schwegmann to inquire further than it did. The facts, moreover, do not suggest that Schwegmann deliberately evaded learning information that would have supplied claims or defenses by Simmons against payment of his note. *Bricks Unlimited, supra.* We conclude that there is no genuine issue of material fact concerning Schwegmann's holder in due course status.

■ Simmons's final challenge relates to the UCC's provision relating to bulk transactions. Simmons alleges that Schwegmann Bank is not a holder in due course since it purchased the note "as a part of a bulk transaction not in the regular course of business of the transferor." La.Rev. Stat. 10:3–302(3)(c). The comment to this subsection provides:

> Subsection 3(c) applies to bulk purchases lying outside of the ordinary business of the seller. It applies, for example, when a new partnership takes over for value all of the assets of an old one after a new member has entered the firm, or to a reorganized or consolidated corporation taking over in bulk the assets of a predecessor. It has particular application to the purchase by one bank of a substantial part of the paper held by another bank which is threatened with insolvency and seeking to liquidate its assets.

Notwithstanding that the Bank of Commerce may have been threatened with insolvency, there is no evidence that Schwegmann purchased a substantial part of the paper held by BOC. On the contrary, the uncontroverted deposition of J. Harper Cox demonstrates that the Quinn–L loans represented less than ten percent of the BOC loan portfolio. There is no argument that Schwegmann's participation in the Quinn–L loan was not in the normal course of both banks' business. Nor is there any argument that the assumption of the loan administration by one of the participants is outside of the normal course of business. Thus, the bulk transaction section, 10:3–302(3)(c), does not apply. We conclude that Schwegmann Bank is a holder in due course of the Simmons note.

## IV. MOTION FOR RECONSIDERATION

■ The final matter that we must consider is Simmons's claim that the district court abused its discretion in denying his motion for reconsideration under Fed.R. Civ.P. 60(b). Simmons filed the motion on September 6, 1988, and on October 4, 1988, we granted Simmons's motion to stay further proceedings in our Court until the district court ruled on the motion for reconsideration. On October 27, 1988, the district court denied that motion. We cannot review that decision, however, because Simmons has never filed a notice of appeal with respect to the district court's October 27, 1988 final order.

In *Harrison v. Byrd,* 765 F.2d 501, 503 (5th Cir.1985) we held that:

> An order denying a Rule 60(b) motion is final and appealable. *Woodham v. American Cystoscope Company of Pelham, N.Y.,* 335 F.2d 551, 554 (5th Cir. 1964).

In *Harrison,* the court held that an appeal of the denial of a Rule 60(b) motion did not bring up the underlying judgment for review. *See also* Wright, Miller & Elliot, *Federal Practice & Procedure,* § 2871 (1973 & 1988 Supp.) (stating that: "An order denying a motion under Rule 60(b) is final and appealable," and that "an appeal from the denial of the motion brings up for review only the order of denial itself and not the underlying judgment.") (and cases cited therein). The converse of *Harrison* follows from the fact that a Rule 60(b) motion is final and appealable: an appeal of the underlying judgment does not bring up a subsequent denial of a Rule 60(b)

motion. Thus, we are without jurisdiction to consider this issue further.

For the foregoing reasons, we *AFFIRM* the judgment of the district court.