NEW BEDFORD INSTITUTION FOR SAVINGS *vs.*
C. L. GILDROY.

No. 92-P-1180.

Bristol. November 18, 1993. - June 15, 1994.

Present: BROWN, KAPLAN, & LAURENCE, JJ.

*Negotiable Instruments*, Holder in due course, Note, Defenses. *Bank.
Loan. Fraud. Words*, "Dealt."

A payee on a promissory note was a holder in due course under provisions
of the Uniform Commercial Code, G. L. c. 106, § 3-302 (1) (*a*)-(*c*),
where the payee took the note for value, in good faith, and without
notice of any defenses available to avoid the obligation on the note.
[651-654] BROWN, J., concurring.

The payee on a promissory note who was a holder in due course had not
"dealt" with a party to an instrument (a purported maker) within the
meaning of that term as used in G. L. c. 106, § 3-305 (2), and the
payee and its transferee, who succeeded to the payee's interest, took the
note free of all personal defenses that maker might assert. [654-656]

A comaker of a promissory note that stated liability of the comakers was
joint and several could not assert want of consideration as a defense
against a holder in due course of the note where, even if he had re-
ceived no benefit, the other comakers had in fact received the proceeds
of the loan underlying the note. [656-657]

The comaker of a promissory note, who had a reasonable opportunity to
discover that he was being asked to sign a negotiable instrument but
who negligently failed to read the document he signed, was not entitled
to assert the defense of fraud in the inception against a holder in due
course of the note. [657-658]

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 6, 1989.

The case was heard by *John A. Tierney*, J.

*Mark A. Pogue*, of Rhode Island, for the plaintiff.

*Vincent M. Amoroso* for the defendant.

LAURENCE, J. In the summer of 1987, C. L. Gildroy, a
Harvard M.B.A. (master of business administration degree)
with many years of experience in banking, real estate, and

venture capital operations, was a coowner of the Hyannis Regency Hotel with Robert F. Welch, Stephen C. Jones, and another. Welch and Jones were at the time also owners of the Taunton Regency Hotel, then under construction, in which Gildroy had no interest. In order to secure funds to complete construction of the Taunton Regency, Welch approached the Taunton Savings Bank (TSB) for a $200,000 loan. Welch represented to TSB that he, Jones, and Gildroy were the owners of the Taunton hotel. That representation was false as to Gildroy. During loan negotiations between Welch and TSB, Welch provided TSB with an altered form of Gildroy's financial statement that described Gildroy as an owner of the Taunton hotel and with promotional literature for a management organization then operating the Hyannis hotel that depicted Gildroy, Welch, and Jones (in both photographic and narrative form) as actively engaged in managing both hotels.

Ultimately TSB approved the loan and prepared a $200,000 promissory note for the signatures of Welch, Jones, and Gildroy. Rather than following TSB's normal procedure of conducting the loan closing with all borrowers present to execute the documents, the responsible TSB officer (apparently to accommodate Welch in hope of acquiring additional business) allowed Welch to take the note out of the bank in order to obtain the signatures of Jones and Gildroy.[1] Welch presented the TSB note to Gildroy in a stack of documents

---

[1]Gildroy asserted at trial and here (in a cross appeal) that TSB's conduct in this respect (which the trial judge characterized as "cutting corners") was negligent or commercially unreasonable. Although the judge found TSB's over-all handling of the transaction to be "rare," "most unusual," and even "contrary to the usual bank practices," he observed that there was no evidence introduced regarding the applicable standard of care or what reasonable bank practices were and that no provision of the Uniform Commercial Code (UCC) imposed any duty of care or of reasonable commercial practice on TBS in such a situation. Gildroy inaptly relies on G. L. c. 106, § 3-406, for the supposed existence of a general standard of commercial reasonableness; but that section of the UCC only applies where an instrument has been altered or contains an unauthorized signature, neither of which here obtains. Consequently, the judge correctly rejected Gildroy's negligence defense.

that Welch advised Gildroy were necessary to sign in connection with applications for refinancing the outstanding construction loan for the Hyannis hotel.

Without reading the note — which was titled in capital letters, "Taunton Savings Bank Commercial Loan Note and Disclosure $200,000.00," and bore the words, immediately above the signature lines, "If this note is signed by more than one person . . . their liabilities hereunder shall be joint and several" — Gildroy affixed his signature under those of Welch and Jones.[2] In accordance with Welch's instructions, TSB, after receiving the fully executed note from Welch, deposited the $200,000 loan proceeds into Taunton Regency's checking account at TSB. TSB was not aware of Welch's machinations or the circumstances that led to Gildroy's signing the note. Gildroy was not aware of the loan negotiations, the loan, or Welch's deception.

Welch and Jones made required monthly interest payments to TSB on the note for about a year. TSB was then acquired by the plaintiff, New Bedford Institution for Savings (NBIS), as a result of which TSB ceased to exist as a separate entity.[3] Shortly thereafter, payments on the note

---

[2]Gildroy justified his failure to read the documents he signed at Welch's behest by stating that he paid attention only to "formal" documents such as would be involved in a loan closing, not to documents relating to preliminary matters such as application forms, which he did not deem important enough to read. This court has frequently commented on the dangers of such an imprudent attitude. See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 440 (1980); *Connecticut Jr. Republic* v. *Doherty,* 20 Mass. App. Ct. 107, 110 (1985); *Mayflower Seafoods, Inc.* v. *Integrity Credit Corp.,* 25 Mass. App. Ct. 453, 459 (1988); *Tiffany* v. *Sturbridge Camping Club, Inc.,* 32 Mass. App. Ct. 173, 175 n.5 (1992). The unfortunate consequences of executing legal documents without full appreciation of their significance have been bewailed in our culture for at least four centuries. See Shakespeare, Henry VI, Part II, act IV, sc. ii ("Is not this a lamentable thing, that of the skin of an innocent lamb should be made parchment? That parchment, being scribbled o'er, should undo a man? Some say the bee stings; but I say, 'tis the bee's wax: for I did but seal once to a thing, and I was never mine own man since").

[3]The trial judge found that NBIS "purchased the stock of TSB" and that the note at issue "was one of the assets of TSB," though never endorsed to NBIS by TSB. NBIS officers variously described the transaction as both an "acqui[sition of] the assets of" TSB and as an "acqui[sition of]

stopped, and the loan went into default. Gildroy had never been contacted by either TSB or NBIS regarding the loan until the default occurred and NBIS demanded payment.[4] Upon the failure of any of the three comakers to remove the default, NBIS commenced this action against them to enforce their joint and several liabilities under the note. While Welch and Jones defaulted, Gildroy responded vigorously, asserting defenses of fraud and want of any consideration flowing to him.

After a bench trial, the judge rejected Gildroy's fraud defense, since neither TSB nor NBIS bore any responsibility for Welch's knavery. He nonetheless ruled for Gildroy, holding that neither TSB (because it was note payee) nor NBIS (because it acquired the note as part of a "bulk transaction," see G. L. c. 106, § 3-302[3][c]) qualified as a holder in due course under G. L. c. 106, our Uniform Commercial Code (UCC). Based upon that ruling, the judge deemed Gildroy's defense of lack of consideration to be available against NBIS, as one not a holder in due course (see G. L. c. 106, § 3-408), under ordinary contract principles. He upheld that defense on the ground that "consideration was not given to any of the comakers, [but] rather to a separate entity at the verbal authorization of one of the comakers [Welch]." Because we conclude that TSB was a holder in due course that took the note free of Gildroy's contract defense, and consequently that NBIS acquired TSB's right to enforce the note

all of the stock and assets of" TSB. Although no relevant documents reflecting this transaction are in the record, it appears to have been a consolidation pursuant to either G. L. c. 168, § 34, or § 34D, under either of which NBIS would be deemed a successor in interest which simply "stepped into the shoes" of TSB with respect to all existing rights and liabilities. Whatever the operative mechanism, there is no real dispute that NBIS effectively "purchased" the note in issue along with all other assets of TSB by virtue of the acquisition transaction.

[4]We reject NBIS's estoppel argument based upon Gildroy's failure to make complaint after TSB allegedly sent him a default notice. The record reveals that the notice was sent not to Gildroy's address as shown on the note, but rather to the address that accompanied Welch's signature. Although that was also the address of the hotel management firm that Gildroy occasionally visited, there was no evidence presented that it was ever his business or residential address.

against Gildroy as transferee pursuant to G. L. c. 106, § 3-201(1), we reverse the judgment in favor of Gildroy.[5]

The judge's understanding that an original payee of a note cannot be a holder in due course is belied by a consistent line of Massachusetts authorities to the contrary, both before promulgation of the UCC (see *Boston Steel & Iron Co.* v. *Steuer*, 183 Mass. 140, 143 [1903]; *New Hampshire Natl. Bank* v. *Garage & Factory Equip. Co.*, 267 Mass. 483, 485 [1929]), and since. See *Rockland Trust Co.* v. *South Shore Natl. Bank*, 366 Mass. 74, 77 (1974); *Simon* v. *Weymouth Agric. & Indus. Soc.*, 389 Mass. 146, 149-150 (1983). The UCC itself so states plainly. See G. L. c. 106, § 3-302(2); Massachusetts Code Comment, Mass. Gen. Laws Ann. c. 106, § 3-302, at 479 (West 1990). Whether TSB, as payee, in fact qualifies as a holder in due course in the instant circumstances depends upon whether it satisfies the requirements that it was a holder of an instrument taken for value, in good faith, and without notice of any defenses against it. See G. L. c. 106, § 3-302(1)(*a*)-(*c*).

---

[5]Because NBIS was a derivative holder in due course by virtue of the "shelter doctrine" codified in § 3-201(1) of the UCC, we need not separately address the merits of the judge's alternative holding, that NBIS did not qualify as a holder in due course in its own right because it purchased the note "as part of bulk transaction not in regular course of business of the transferor." G. L. c. 106, § 3-302(3)(*c*), as inserted by St. 1957, c. 765, § 1. We note that there is no Massachusetts decision interpreting the bulk transaction exception to holder in due course status, save for an early opinion devoid of meaningful analysis in *Credit Indus. Corp.* v. *DiNanno*, 29 Mass. App. Dec. 40, 43 (1964). At least two other jurisdictions have considered the provision in the context of a bank merger or consolidation. See *First Alabama Bank of Guntersville* v. *Hunt*, 402 So. 2d 992, 994 (Ala. Civ. App. 1981); *Rosa* v. *Colonial Bank*, 207 Conn. 483, 489-491 (1988). Earlier holdings deal with the effect of bank consolidations on holder in due course status under the pre-UCC negotiable instruments law. See *National Bank of Lima* v. *Deaton*, 279 Ky. 606, 610-611 (1939); *Vogel* v. *Zipp*, 90 S.W.2d. 668, 671 (Tex. Civ. App. 1936). We finally observe that NBIS might well not have been a "holder," let alone a holder in due course in its own right, because TSB was the payee of the note and did not endorse it to NBIS. See G. L. c. 106, § 1-201(20), as appearing in St. 1983, c. 522, § 3, defining a "holder" as "a person who is in possession of . . . an instrument . . . drawn, issued, or indorsed to him or his order or to bearer or in blank." Neither party has discussed this point.

TSB was undoubtedly a holder of the $200,000 note as defined in G. L. c. 106, § 1-201(20), as inserted by St. 1957, c. 765, § 1 ("a person who is in possession of . . . an instrument . . . drawn, issued, or indorsed to him or his order. . ."). The payee of an instrument in its possession is always a holder. See Hart & Willier, 2 Bender's Uniform Commercial Code Service § 11.02[1], at 11-19 (1994). TSB took the note for value when it deposited the $200,000 loan proceeds into the Taunton Regency's checking account in return for the note, which constituted its performance of the agreed consideration. See G. L. c. 106, § 3-303(*a*), (*c*); *Bricks Unlimited, Inc.* v. *Agee*, 672 F.2d 1255, 1258 (5th Cir. 1982). As to good faith, the judge expressly found that TSB was "not aware of how the note was signed" and "[a]t the time of the approval of the loan, TSB had no way of knowing whether . . . Gildroy's signature was genuine." These unchallenged findings are supported by the evidence and are sufficient to constitute the subjective, "honesty in fact" test for good faith in Massachusetts. See G. L. c. 106, § 1-201(19); Massachusetts Code Comment, Mass. Gen. Laws Ann. c. 106, § 3-302(1)(b), at 478 (West 1990); *Industrial Natl. Bank of R.I.* v. *Leo's Used Car Exchange, Inc.*, 362 Mass. 797, 801-802 (1973); *Bowling Green, Inc.* v. *State St. Bank & Trust Co.*, 425 F.2d 81, 85 (1st Cir. 1970).[6]

Finally, TSB had no "notice" of any defenses available to Gildroy to avoid his obligation on the note, in the sense of having reason to know of it from all the facts and circumstances of which it was aware at the time. See G. L. c. 106,

---

[6]Contrast the original form of the UCC as first promulgated in Pennsylvania (P.L. 3, No. 1, 1953), which in § 3-302(1)(b) defined "good faith" for holder in due course status as requiring "observance of the reasonable commercial standards of any business in which the holder may be engaged." Contrast also the 1990 revision of Article 3 by the American Law Institute, which similarly expands the definition of "good faith" for Article 3 purposes to include "the observance of reasonable commercial standards of fair dealing" as well as "honesty in fact." See Uniform Commercial Code (Revised) § 3-103(a)(4), 2 U.L.A. 22 (1991). The absence of such qualifying language in our UCC is additional support for the judge's rejection of Gildroy's negligence defense. See note 1, *supra*.

§§ 1-201(25), 3-304(1)(*b*).[7] Despite the judge's findings that TSB did not follow its usual procedures on this particular loan transaction, apparently because of its desire to attract additional business from Welch, those irregularities were not deemed sufficient to constitute negligence on TSB's part.[8] Further, a holder has no duty to inquire unless "the circumstances reveal a deliberate desire by the holder to evade knowledge of claims made by the maker." *Schwegmann Bank & Trust Co. of Jefferson* v. *Simons*, 880 F.2d 838, 842 (5th Cir. 1989). See also *Bricks Unlimited, Inc.* v. *Agee*, 672 F.2d at 1259; *Carnegie Bank* v. *Shalleck*, 256 N.J. Super. 23, 35 (1992).

No such deliberately cultivated ignorance emerges or can be gleaned from the record before us. Compare *Universal C.I.T. Credit Corp.* v. *Ingel*, 347 Mass. 119, 125 (1964) (even when the plaintiff-assignee of the note and the original payee had worked together on the financing, which made the assignee aware of complaints prior customers had lodged against the payee for its allegedly fraudulent representations, this was not sufficient for the assignee to have had reason to know of any fraud). However unorthodox TSB's handling of this loan may have been relative to its regular usages, no evidence was introduced, nor argument made, demonstrating any deviation by TSB from an applicable standard of care or from reasonable banking practices in similar loan transactions. (See note 1, *supra*.) The circumstances of the loan, albeit unusual, were not sufficient to put TSB on notice of Gildroy's defense of fraud. Cf. *Carnegie Bank* v. *Shalleck*, 256 N.J. Super. at 35 ("While plaintiff should have employed better banking practices in deciding whether to make the loan to Anderson with or without Hagan's guaranty, no evi-

---

[7]The judge's findings mentioned in the preceding paragraph negate any actual knowledge of Welch's fraud on the part of TSB.

[8]"[N]egligence has [a] role in the determination of a holder's status as a holder in due course under § 3-302 [in that it] goes to the notice requirement of § 3-302(1)(*c*), as defined by § 3-304, and § 1-201(25)." *Industrial Natl. Bank of R.I.* v. *Leo's Used Car Exchange*, 362 Mass. at 802. No finding or evidence, however, supports Gildroy's contention that TSB was negligent in its handling of the transaction. See notes 1 and 6, *supra*.

dence was presented that Carnegie was aware or even suspected a fraud was being perpetrated").

Since TSB was a holder in due course, NBIS as its transferee acquired the rights of a holder in due course by virtue of its succession to all of TSB's interest. See G. L. c. 106, § 3-201(1); c. 168, §§ 34 & 34D; *Duxbury* v. *Roberts*, 388 Mass. 385, 388 (1983); Hart & Willier, *supra* § 12.02[2], at 12-26 to 12-28. Those derivative rights are, however, "subject to the defenses of any party to the instrument with whom the [original] holder has dealt."[9] *Travi Constr. Corp.* v. *First Bristol County Natl. Bank*, 10 Mass. App. Ct. 32, 37 (1980). See G. L. c. 106, § 3-305(2); Hart & Willier, *supra.* Although the term "dealt" has been subject to no construction in Massachusetts and little elsewhere, we are persuaded that it requires a direct, face to face, personal interchange not here involved.

The analysis of this aspect of the case begins with Uniform Commercial Code comment 2(c) to § 3-302, 2 U.L.A. 487-488 (1991), which sets forth an example of a payee who is deemed a full holder in due course in circumstances remarkably similar to the present case: "A [Welch] and B [Gildroy] sign a note as co-makers . . . A [Welch having] induce[d] B [Gildroy] to sign by fraud, and without authority from B [Gildroy] [A, Welch] delivers the note to P[ayee, TSB], who takes it for value, in good faith and without notice." Six additional examples of payees who are holders in due course are given in comment 2, all premising a payee who has not dealt personally and directly with the obligor on the instrument.

The few courts and treatises that have addressed the meaning of "dealt" in § 3-305(2) have linked the examples of § 3-302's comment 2 to the personal defenses preserved by § 3-305(2) and have opined that a payee who does not

---

[9]This qualification of the rights of a holder in due course was presumably what the judge had in mind when he stated, as an alternative basis for his ruling, that since TSB "was an immediate party to the Note and the original makers . . . NBIS takes the Note subject to all defenses that the original makers had against the original payee."

actually deal with a drawer or maker (and otherwise qualifies as a holder in due course) takes free of those defenses (including lack of consideration). The rationale is that such a payee is not so directly and personally involved with the disputed aspects of the transaction as to be charged with knowledge of any fraud or other irregularity and therefore should not be deprived of holder in due course status. See *Chicago Title & Trust Co.* v. *Walsh*, 34 Ill. App. 3d 458, 468-469 (1975); *Village Motors, Inc.* v. *American Fed. Savs. & Loan Assn.*, 231 Va. 408, 409-410, 412 (1986); 1 White & Summers, Uniform Commercial Code § 14.7, at 718-719 (3d ed. 1988); Uniform Commercial Code (Revised) § 3-302, comment 4, case 2, 2 U.L.A. 65-66 (1991); 6 Anderson, Uniform Commercial Code § 3-305: 87 (1993). Cf. *United States* v. *Mark Twain Bank-Kansas City*, 771 F.2d 361, 365 (8th Cir. 1985). Contrast *Standard Fin. Co.* v. *Ellis*, 3 Haw. App. 614, 617 (1983) (plaintiff seeking to enforce notes "dealt" with defendant maker because it explained the terms and conditions of the notes to the defendant and witnessed the defendant signing the notes).

The underlying philosophy of these authorities — that an innocent person who receives commercial paper in good faith and for value from one who has obtained it by a misrepresentation or fraud should be protected and allowed to enforce the obligation — is reflected in the law of contracts, see Restatement (Second) of Contracts § 164(2) & comment e (1979), and the law of suretyship, see Restatement of Security § 119 (1941). Given the importance to our economy of facilitating commerce in general and the transferability and circulation of commercial paper in particular, such a principle appears appropriately invoked when construing the rights of an otherwise qualified holder in due course. Accordingly, we hold that TSB did not "deal" with Gildroy within the meaning of G. L. c. 106, § 3-305(2). TSB would not, therefore, be subject to Gildroy's lack of consideration (or any

other personal) defense, and neither is NBIS as successor in interest to TSB.[10]

Even, however, were we to agree with Gildroy's unadorned assertion that he was a person with whom TSB "dealt,"[11] it would not support the judge's conclusion that the defense of want of consideration was available to Gildroy.[12] As earlier noted, TSB gave value for the note when it paid the loan proceeds into an account available to Welch and Jones — an indisputable detriment to TSB that legally satisfied the consideration requirement. See *Cottage St. Methodist Episcopal Church* v. *Kendall*, 121 Mass. 528, 529-530 (1877); *Graphic Arts Finishers, Inc.* v. *Boston Redev. Authy.*, 357 Mass. 40, 42-43 (1970); *Marine Contractors Co.* v. *Hurley*, 365 Mass. 280, 284 (1974). At least two of the comakers, Welch and Jones, undoubtedly received direct benefit from TSB's performance by drawing out the proceeds of the loan. As the document Gildroy signed plainly stated, the liability of the

---

[10]The A.L.I.'s 1990 revision of Article 3's definition of holder in due course provides illustrations of innocent payees not directly involved with an obligor who can, as in the examples under the prior version of § 3-302, comment 2(c), mentioned *supra*, be deemed holders in due course, and explicitly adds that such payees take free of the obligor's defenses. This is a helpful clarification of the principle implicit in the authorities discussed above. See Uniform Commercial Code (Revised) § 3-302, comment 4, 2 U.L.A. 64-66 (1991).

[11]Gildroy's brief is emphatic in distancing himself from TSB: "Gildroy and TSB never came face to face and never communicated with each other during the entire transaction. . . . [No representative] of the bank [TSB] ever bothered to communicate with Gildroy prior to the transaction. . . . Gildroy never attended any closing at the bank. . . . Even after the loan was executed there was no contact between Gildroy and TSB until Jones and Welch defaulted in payment." Nonetheless, he maintains that TSB still "dealt" with him and thereby rendered itself subject to his personal defense against liability on the note. He provides no authority or legal analysis for that naked contention. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *McCone* v. *New England Tel. & Tel. Co.*, 393 Mass. 231, 236 (1984).

[12]The judge appeared to ground his ruling regarding the consideration issue on his determination that NBIS was not a holder in due course under any theory and was therefore subject to the defense of lack of consideration under G. L. c. 106, § 3-408. Given our view that the consideration requirement was satisfied here, the actual basis for the judge's conclusion is irrelevant.

comakers was joint and several. See G. L. c. 106, § 3-118(*e*). The fact that one of the joint and several obligors did not personally receive any benefit from the transaction is immaterial; consideration enjoyed by any one of the co-obligors is sufficient to support the promissory note. See *Armstrong* v. *Armstrong*, 714 F. Supp. 451, 454 (D. Colo. 1989); *Baum* v. *Abel*, 379 S.W.2d 164, 165-166 (Mo. App. 1964); *Lassiter* v. *Boxwell Bros., Inc.*, 362 S.W.2d 884, 886 (Tex. Civ. App. 1962).[13]

Finally, although Gildroy has not contested the judge's rejection of his fraud defense, we address it briefly, since the kind of fraud here alleged (sometimes referred to as "fraud in the factum" or fraud in the inception) is one of the "real" defenses that can be interposed against even the most purehearted and scrupulously attentive holder in due course: "such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." G. L. c. 106, § 3-305(2)(*c*), as inserted by St. 1957,

---

[13]The judge correctly acknowledged this principle of joint and several comaker liability and specifically stated that "one comaker is liable even if the consideration for the note is given to another comaker." He erred, however, in his view that none of the three comakers actually benefited from the loan because the proceeds went to "a separate entity," the Taunton Regency hotel, in light of the uncontested facts that the hotel was owned and controlled by Jones and Welch and that Welch was the sole authorized signatory for the hotel's checking account at TSB and actually drew the checks on that account, ultimately exhausting the loan proceeds. It is established in our law that the physical movement of consideration — whether from promisee directly to promisor, from promisee to a third party at the promisee's direction, or from a third person at the promisee's direction to the promisor — is irrelevant, so long as the promisee incurs a detriment or the promisor receives a benefit. See *Old Colony Trust Co.* v. *Commissioner of Corps. & Taxn.*, 346 Mass. 667, 671 (1964); *Marine Contractors Co.* v. *Hurley*, 365 Mass. at 286; *John Deere Co.* v. *Broomfield*, 803 F.2d 408, 410 (8th Cir. 1986); *First City Natl. Bank & Trust Co.* v. *Zellner*, 782 F. Supp. 232, 236 (S.D.N.Y. 1992); Restatement (Second) of Contracts § 71 (4); 1 Corbin, Contracts § 124 (1963). We agree with NBIS that courts throughout the United States have routinely imposed liability on individual comakers who themselves received no consideration, so long as loan funds were actually disbursed and at least one comaker or his designee has received a benefit. Gildroy has not cited a single authority from any jurisdiction to the contrary.

c. 765, § 1. The record, however, irrefutably deprives Gildroy of such a defense. See note 2, *supra*. On his own testimony, he did have a reasonable opportunity to discover that he was being asked to sign a negotiable instrument. His failure to have done so was properly ruled negligent by the judge, since even casual examination would have immediately exposed and ended the fraud Welch was perpetrating upon him. Gildroy not only suffered no constraints preventing his reading the document, he admitted that he had seen enough of the top of the paper to assert, at his deposition, that the typed word "Commercial" (which appears next to and on the same line as the words "Loan Note and Disclosure," printed in capital letters) was not on the document when he signed it.

For the foregoing reasons, we vacate the judgment below and remand the case to the Superior Court for a determination of NBIS's damages and further proceedings not inconsistent with this opinion.

*So ordered.*

BROWN, J. (concurring). Although I concur in the result reached by the majority, I am hard pressed to accept the notion that in such circumstances as presented here there must be an affirmative showing of "deliberately cultivated ignorance" on the part of the holder. See *Schwegmann Bank & Trust Co. of Jefferson* v. *Simons*, 880 F.2d 838, 842 (5th Cir. 1989). I deem TSB's handling of the loan not "unorthodox" but negligent — plainly contrary to proper banking practices. Here, TSB certainly placed itself, by such an improvident choice, in a precarious position, whereby it was plainly vulnerable to fraud. After saying all that, I concur in the result because an experienced businessman (let alone a Harvard M.B.A.) surely ought to know that he assumes a risk when he "gets into bed" with someone, as well as to know he must first read "what he signs." Parenthetically, if that imperative was not inculcated firmly at "business school," he should be entitled to a refund of his tuition.

Finally, I am compelled to point out that the bulk of the work product (i.e., research and analysis) evidenced in this opinion was done by the *court*. All too often this court is compelled to range far and wide from the parties' briefs to reach what I believe is the correct and proper legal solution.