1999 ME 43

**MAINE FAMILY FEDERAL
CREDIT UNION**

v.

**SUN LIFE ASSURANCE COMPANY
OF CANADA et al.**

Supreme Judicial Court of Maine.

Argued Nov. 4, 1998.
Decided March 3, 1999.

Daniel L. Cummings (orally), Norman, Hanson & DeTroy, Portland, for plaintiff.

Seth W. Brewster (orally), James G. Goggin, Verrill & Dana, LLP, Portland, for defendant Sun Life Assurance.

Elliott L. Epstein (orally), Isaacson & Raymond, P.A., Lewiston, for defendants Daniel, Joel, and Claire Guerrette.

Gretchen L. Jones, Maine Credit Union League, Portland, for amicus curiae.

Before WATHEN, C.J., and RUDMAN, SAUFLEY, and ALEXANDER, JJ.

SAUFLEY, J.

[¶ 1] We are called upon here to address the concept of "holder in due course" as defined by recent amendments to the negotiable instruments provisions of the Maine Uniform Commercial Code. We conclude that, pursuant to those amendments, the Superior Court (Cumberland County, *Calkins*, J.) did not err when it entered a judgment based on the jury's finding that the Maine Family Federal Credit Union was not a holder in due course. Because we find, however, that Sun Life Assurance Company was not entitled to raise a third party's defense of fraud to its liability as drawer of the instruments, we vacate that portion of the judgment entered in favor of Sun Life and against the Credit Union.

## I. Facts

[¶ 2] Daniel, Joel, and Claire Guerrette are the adult children of Elden Guerrette, who died on September 24, 1995. Before his death, Elden had purchased a life insurance

policy from Sun Life Assurance Company of Canada, through Sun Life's agent, Steven Hall, and had named his children as his beneficiaries. Upon his death, Sun Life issued three checks, each in the amount of $40,759.35, to each of Elden's children.[1] The checks were drawn on Sun Life's account at Chase Manhattan Bank in Syracuse, New York.[2] The checks were given to Hall for delivery to the Guerrettes.

[¶ 3] The parties have stipulated that Hall and an associate, Paul Richard, then fraudulently induced the Guerrettes to indorse the checks in blank and to transfer them to Hall and Richard, purportedly to be invested in "HER, Inc.," a corporation formed by Hall and Richard.[3] Hall took the checks from the Guerrettes and turned them over to Richard, who deposited them in his account at the Credit Union on October 26, 1995.[4] The Credit Union immediately made the funds available to Richard.

[¶ 4] The Guerrettes quickly regretted having negotiated their checks to Hall and Richard, and they contacted Sun Life the next day to request that Sun Life stop payment on the checks. Sun Life immediately ordered Chase Manhattan to stop payment on the checks.[5] Thus, when the checks were ultimately presented to Chase Manhattan for payment, Chase refused to pay the checks, and they were returned to the Credit Union.

[¶ 5] The Credit Union received notice that the checks had been dishonored on November 3, 1995, the sixth business day following their deposit.[6] By that time, however, Richard had withdrawn from his account all of the funds represented by the three checks. The Credit Union was able to recover almost $80,000 from Richard, but there remained an unpaid balance of $42,366.56, the amount now in controversy.

[¶ 6] The Credit Union filed a complaint against Sun Life alleging that Sun Life was liable as drawer of the instruments, and that Sun Life had been unjustly enriched at the Credit Union's expense. Although it could have done so, the Credit Union did not originally seek any recovery from the Guerrettes. Sun Life, however, filed a third-party complaint against Daniel Guerrette and Paul Richard, whose signatures appeared on the

---

1. " 'Issue' means the first delivery of an instrument by the maker or drawer, whether to a holder or nonholder, for the purpose of giving rights on the instrument to any person." 11 M.R.S.A. § 3–1105(1) (1995).

2. Accordingly, Sun Life was the drawer of the checks. " 'Drawer' means a person who signs or is identified in a draft as a person ordering payment." 11 M.R.S.A. § 3–1103(1)(c) (1995). Chase Manhattan was the "drawee." " 'Drawee' means a person ordered in a draft to make payment." 11 M.R.S.A. § 3–1103(1)(b) (1995). More specifically, Chase Manhattan was also the "payor bank." " 'Payor bank' means a bank that is the drawee of a draft." 11 M.R.S.A. § 4–105(2) (1995).

3. " 'Indorsement' means a signature, other than that of a signer as maker, drawer or acceptor, that alone or accompanied by other words is made on an instrument for the purpose of: (a) Negotiating the instrument; (b) Restricting payment of the instrument; or (c) Incurring indorser's liability on the instrument." 11 M.R.S.A. § 3–1204(1) (1995).

4. Maine Family Federal Credit Union is a "federally chartered credit union," regulated by the National Credit Union Administration. *See* 12 U.S.C.A. § 1752a (Law.Co-op.1996). It qualifies as an "insured credit union" under the Federal Credit Union Act, 12 U.S.C.A. §§ 1751–1795k

(Law. Co-op.1996 & Supp.1998), and is therefore subject to the provisions of Regulation CC. 12 C.F.R. § 229 (1998).

By accepting the checks for deposit, Maine Family Federal Credit Union became the "depositary bank." Under Maine law, " '[d]epositary bank' means the first bank to take an item ... unless the item is presented for immediate payment over the counter." 11 M.R.S.A. § 4–105(1) (1995).

5. "A customer ... may stop payment of any item drawn on the customer's account ... by an order to the bank describing the item or account with reasonable certainty received at a time and in a manner that affords the bank a reasonable opportunity to act on it before any action by the bank with respect to the item...." 11 M.R.S.A. § 4–403(1) (1995). Thus Sun Life, as the customer of Chase Manhattan Bank, had the right to order Chase Manhattan to stop payment on the three checks deposited by Paul Richard at the Maine Family Federal Credit Union.

6. "Notice of dishonor may be given by any person and by any commercially reasonable means, including an oral, written or electronic communication, and is sufficient if it reasonably identifies the instrument and indicates that the instrument has been dishonored or has not been paid or accepted." 11 M.R.S.A. § 3–1503(2) (1995).

back of one of the checks.[7] The Credit Union then filed a cross-claim against third-party defendants Guerrette and Richard, alleging that they were liable as indorsers of the checks,[8] and Daniel Guerrette filed cross-claims against the Credit Union and against Sun Life. Finally, Sun Life eventually filed third-party complaints against Joel and Claire Guerrette.

[¶ 7] The Credit Union moved for summary judgment. The Superior Court held, as a matter of law, that Daniel Guerrette had raised a "claim of a property or possessory right in the instrument or its proceeds," 11 M.R.S.A. § 3–1306 (1995), and therefore that Sun Life was entitled to assert that claim as a "defense" against the Credit Union. *See* 11 M.R.S.A. § 3–1305(3) (1995).[9] The court found, however, that a genuine issue of material fact remained as to whether the Credit Union had acted in "good faith" when it gave value for the checks—a fact relevant to determining whether the Credit Union was a holder in due course. *See* 11 M.R.S.A. § 3–1302(1)(b)(ii) (1995). Accordingly, the court denied the Credit Union's motion for summary judgment, and the matter proceeded to trial.

[¶ 8] At trial, the only issue presented to the jury was whether the Credit Union had acted in "good faith" when it gave value for the checks, thus entitling it to holder in due course status.[10] At the close of evidence, the Credit Union made a motion for a judgment as a matter of law, which the Superior Court denied. The jury found that the Credit Union had not acted in good faith and therefore was not a holder in due course. Therefore, the Superior Court entered judgment in favor of Sun Life, Daniel, Joel, and Claire, and against the Credit Union. The court denied the Credit Union's renewed motion for judgment as a matter of law and motion to amend the judgment, and the Credit Union filed this appeal.

## II. Obligations of the Parties

[¶ 9] At the heart of the controversy in this case is the allocation of responsibility for the loss of the unpaid $42,366.56, given the fact that Paul Richard and Steven Hall, the real wrongdoers, appear to be unable to pay. Maine, like the other forty-nine states, has adopted the Uniform Commercial Code. Under the Maine U.C.C., Articles 3–A and 4 deal with "Negotiable Instruments" and "Bank Deposits and Collections." *See* 11 M.R.S.A. §§ 3–1101, 4–101 (1995). It is these statutes that govern the parties' dispute.

[¶ 10] Pursuant to Article 4 of the Maine U.C.C., the Credit Union, as a depositary bank, is a "holder" of the instruments,[11] see

---

7. For reasons that have remained unexplained, Daniel Guerrette and Paul Richard together filed a joint answer to the original third-party complaint. Paul Richard, of course, later stipulated that he had fraudulently induced Daniel Guerrette to transfer the check to him.

8. Paul Richard ultimately consented to judgment being entered against him on the Credit Union's cross-claim.

9. Section 3–1305(3) provides, in part:

> . . . [I]n an action to enforce the obligation of a party to pay the instrument, the obligor may not assert against the person entitled to enforce the instrument a defense, claim in recoupment or claim to the instrument (section 3–1306) of another person, but the other person's claim to the instrument may be asserted by the obligor if the other person is joined in the action and personally asserts the claim against the person entitled to enforce the instrument.
> 11 M.R.S.A. § 3–1305(3).

10. The parties stipulated to the fact that Daniel, Joel, and Claire were defrauded by Hall and Richard, and Paul Richard consented to the entry of judgment against him in the amount of $42,366.56 on the Credit Union's cross-claim against him. In addition, the parties stipulated that the Credit Union had incurred damages in the amount of $42,366.56. The parties' cooperation in crafting the stipulations appropriately allowed the court and the jury to focus on the only issue in dispute.

11. An "instrument" refers to a "negotiable instrument." See 11 M.R.S.A. § 3–1104(2) (1995). A "negotiable instrument" is a signed writing evidencing an unconditional promise or order to pay a fixed sum of money on demand or at a definite time to order or to bearer. *See generally* 11 M.R.S.A. §§ 3–1104(1), 3–1103(1)(i), 3–1104 cmt. 1 (1995). A "draft" is a negotiable instrument that is an order. See 11 M.R.S.A. § 3–1104(5) (1995). The definition of a "check" includes "[a] draft, other than a documentary draft, payable on demand and drawn on a bank." See 11 M.R.S.A. § 3–1104(6)(a) (1995).

11 M.R.S.A. § 4–205(1) (1995),[12] making it a "person entitled to enforce" the instrument under Article 3–A. *See* 11 M.R.S.A. § 3–1301(1) (1995). Upon producing an instrument containing the valid signature of a party liable on the instrument, a person entitled to enforce the instrument is entitled to payment, unless the party liable proves a defense or claim in recoupment, *see* 11 M.R.S.A. § 3–1308(2) (1995), or a possessory claim to the instrument itself. *See* 11 M.R.S.A. § 3–1306.

[¶ 11] Because their signatures appear on the backs of the checks, Daniel, Joel, and Claire are "indorsers" of the checks. *See* 11 M.R.S.A. § 3–1204(1), (2) (1995). As indorsers, they are obligated to pay the amounts due on each dishonored instrument "[a]ccording to the terms of [each]˙ instrument at the time it was indorsed." 11 M.R.S.A. § 3–1415(1)(a) (1995).[13] This obligation is owed "to a person entitled to enforce the instrument or to a subsequent indorser who paid the instrument under this section." *Id.*

[¶ 12] As drawer of the checks, Sun Life is obligated to pay each dishonored instrument "[a]ccording to its terms at the time it was issued." 11 M.R.S.A. § 3–1414(2)(a) (1995). Again, this obligation is owed to a person entitled to enforce the instrument or to an indorser who paid the draft under section 3–1415. *See* 11 M.R.S.A. § 3–1414(2) (1995). Chase Manhattan, as drawee of these checks, was not obligated to accept them for payment, *see* 11 M.R.S.A. § 3–1408 (1995), and therefore has not been made a party to this action.

[¶ 13] Unless the Credit Union is a holder in due course, its right to enforce the obligations of the drawer and indorsers of the instruments is subject to a variety of defenses, including all those defenses available "if the person entitled to enforce the instrument[s] were enforcing a right to payment under a simple contract." *See* 11 M.R.S.A. § 3–1305(1)(b) (1995). In addition, its right to enforce is subject to any claims in recoupment, *see* 11 M.R.S.A. § 3–1305(1)(c) (1995), or claims to the instruments themselves. *See* 11 M.R.S.A. § 3–1306. If, however, the Credit Union establishes that it is a "holder in due course," it is subject to only those few defenses listed in section 3–1305(1)(a). *See* 11 M.R.S.A. § 3–1305(2) (1995). None of those specific defenses is applicable here. Thus, the Credit Union argues that because it is entitled as a matter of law to holder in due course status, it is entitled to enforce the instruments against the Guerrettes and Sun Life.

### III. Holder in Due Course

#### A. Burden of Proof and Standard of Review

[¶ 14] A holder in due course is a holder who takes an instrument in good faith, for value, and without notice of any claims or defenses. *See* 11 M.R.S.A. § 3–1302(1) (1995). Once the persons who may be liable on the instruments have raised a recognized defense to that liability, the burden is on the holder to prove by a preponderance of the evidence that it is a holder in due course. *See New Bedford Inst. for Sav. v. Gildroy*, 36 Mass.App.Ct. 647, 634 N.E.2d 920, 925 (1994).[14] If it fails in that proof, the persons

---

**12.** 11 M.R.S.A. § 4–205(1) provides that a depositary bank becomes a holder of an item if the item was deposited by a customer who was also a holder. The Credit Union's customer, Paul Richard, became a holder of the checks when Daniel, Joel, and Claire indorsed them in blank and transferred them to Richard and Hall. *See* 11 M.R.S.A. § 3–1201(1) (1995) (" 'Negotiation' means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder."); 11 M.R.S.A. § 3–1202(1)(b) (1995) ("Negotiation is effective even if obtained . . . [b]y fraud.").

**13.** If, however, the instrument is accepted for payment, if the instrument is not presented for

payment in a timely fashion, or if notice of dishonor is not given to an indorser in a timely fashion, her indorser's liability is discharged. *See* 11 M.R.S.A. § 3–1415(3)–(5) (1995).

**14.** The Credit Union argues that neither Sun Life nor Daniel Guerrette satisfied their burdens of pleading with respect to the issue of fraud. A party may satisfy his burden of pleading a specific affirmative defense if he puts the opposing parties on notice that the issue will be raised at trial. *See Bolduc v. Watson*, 639 A.2d 629, 630 (Me.1994); *Federal Deposit Ins. Corp. v. Notis*, 602 A.2d 1164, 1165 (Me.1992). Contrary to the Credit Union's argument, the pleadings were sufficient to alert the Credit Union that fraud would

otherwise liable on the instruments may avoid liability if they prove a defense, claim in recoupment, or possessory claim to the instrument. *See* 11 M.R.S.A. §§ 3–1305(1)(b), 3–1308(2).

[¶ 15] The issue of whether a party is a holder in due course is usually one of fact, although "where the facts are undisputed and conclusive, [a court] can determine ... holder in due course status as a matter of law." *See Triffin v. Dillabough*, 552 Pa. 550, 716 A.2d 605, 611 (1998). In this case, the Superior Court declined to decide the holder in due course issue as a matter of law, and submitted the question to the jury. The jury found that the Credit Union was not a holder in due course, implicitly because the Credit Union did not act in good faith.

[¶ 16] The Credit Union argues that the court erred in failing to find, as a matter of law, that it was a holder in due course. "We review the denial of a motion for judgment as a matter of law 'to determine if any reasonable view of the evidence and those inferences that are justifiably drawn from that evidence supports the jury verdict.'" *Larochelle v. Cyr*, 707 A.2d 799, 1998 ME 52, ¶ 6, 707 A.2d 799 (quoting *Davis v. Currier*, 1997 ME 199, ¶ 3, 704 A.2d 1207). The question before us, therefore, is whether any reasonable view of the evidence, along with any justifiable inferences therefrom, can possibly support the jury's conclusion that the Credit Union did not act in good faith and therefore was not a holder in due course. Alternatively stated, the question is whether the evidence compelled a finding that the Credit Union was a holder in due course. If

there is any rational basis for the jury's verdict, we must affirm the judgment.

### B. Good Faith

[¶ 17] We therefore turn to the definition of "good faith" contained in Article 3–A of the Maine U.C.C.[15] In 1990, the National Conference of Commissioners on Uniform State Law recommended substantial changes in the U.C.C. The Maine Legislature responded to those recommendations in 1993 by repealing the entirety of Article 3 and enacting a new version entitled Article 3–A, which contains a new definition of "good faith." While the previous version of the good faith definition only required holder to prove that it acted with "honesty in fact," the new definition provides:

> "Good faith" means honesty in fact *and the observance of reasonable commercial standards of fair dealing.*

11 M.R.S.A. § 3–1103(1)(d) (1995) (emphasis added). Because the tests are presented in the conjunctive, a holder must now satisfy both a subjective and an objective test of "good faith." [16]

### 1. Honesty in Fact

[¶ 18] Prior to the changes adopted by the Legislature in 1993, the holder in due course doctrine turned on a subjective standard of good faith and was often referred to as the "pure heart and empty head" standard. *See* M.B.W. Sinclair, *Codification of Negotiable Instruments Law: A Tale of Re-iterated Anachronism,* 21 U. Tol. L.Rev. 625, 654 (1990); *see also Seinfeld v. Commercial Bank & Trust Co.,* 405 So.2d 1039, 1042 (Fla.Dist.Ct.App.1981) (noting that the U.C.C. "seem[s] to protect the objectively

---

be raised as an issue to shield the defendants from liability. The Credit Union's argument is therefore without merit.

15. We reject the Credit Union's argument that the good faith element of holder in due course status was not intended to encompass the giving of value for the check. Unless the depositary bank has given value, it cannot become a holder in due course, and its conduct is not scrutinized for compliance with section 3–1302. To determine whether a holder is a holder in due course, the factfinder must determine whether the holder acted with good faith when it took the checks and gave value for them.

16. The U.C.C. Prefatory Note of National Conference of Commissioners on Uniform State Laws and the American Law Institute lists the new definition of "good faith" among the "benefits to users" of the revised Article 3. The Notes states that:

> The definition of good faith...is expanded to include observance of reasonable commercial standards of fair dealing. This objective standards for good faith applies to the performance of all duties and obligations established under Articles 3 and 4.

stupid so long as he is subjectively pure at heart"). That standard merely required a holder to take an instrument with "honesty in fact" to become a holder in due course.[17]

[¶ 19] Courts interpreting this language have routinely declared banks to be holders in due course, notwithstanding the failures of these banks to investigate or hold otherwise negotiable instruments, when they took the instruments with no knowledge of any defects, defenses, or stop payment orders. *See, e.g., UAW–CIO Local # 31 Credit Union v. Royal Ins. Co.*, 594 S.W.2d 276, 279 (Mo. 1980) (en banc); *Bank of New York v. Asati, Inc.*, 15 UCC Rep.Serv.2d (CBC) 521, 1991 WL 322989 (N.Y.Sup.Ct. July 8, 1991). This approach has been understood to promote the negotiability of instruments, particularly checks, in the stream of commerce. Rejecting a contrary approach, one court put it bluntly:

> The requirement urged by defendant would bring the banking system to a grinding halt. A stop payment order issued by the drawer to the drawee which is unknown to the paying-collecting bank cannot fasten upon the paying bank any legal disability; particularly it cannot reduce the status of the collecting bank to a mere assignee of the instrument or a holder of a non-negotiable instrument, or a mere holder of a negotiable instrument.

*Mellon Bank, N.A. v. Donegal Mutual Ins. Co.*, 29 UCC Rep.Serv. (CBC) 912, 1980 WL 98414 (Pa. Ct. C.P. Alleghany County, Jan. 8, 1980).

[¶ 20] Although courts were often urged to engraft an objective reasonableness standard onto the concept of "honesty in fact," most refused to do so.[18] Their refusals recognized that: "[T]he check is the major method for transfer of funds in commercial practice. The maker, payee, and endorsers of a check naturally expect it will be rapidly negotiated and collected.... The wheels of commerce would grind to a halt [if an objective standard were adopted]." *Bowling Green, Inc. v. State St. Bank & Trust*, 425 F.2d 81, 85 (1st Cir.1970).

[¶ 21] Moreover, under the purely subjective standard, a bank was not expected to require the presence of offsetting collected funds in the customers' account in order to give value on newly deposited checks: "A bank's permitting its customers to draw against uncollected funds does not negate its good faith." *Asati, Inc.*, 15 UCC Rep. Serv.2d at 521; *accord Vail Nat'l Bank v. J. Wheeler Constr. Corp.*, 669 P.2d 1038, 1039–40 (Colo.Ct.App.1983); *Flagship Bank of Orlando v. Central Florida Coach Lines, Inc.*, 33 UCC Rep.Serv. (CBC) 613, 1981 WL 138010 (Pa. Ct. C.P. Luzerne County, Oct. 13, 1981); *Mellon Bank*, 29 U.C.C. Rep.Serv. at 912; *Central Bank & Trust Co. v. First Northwest Bank*, 332 F.Supp. 1166, 1170 (E.D.Mo.1971), *aff'd*, 458 F.2d 511 (8th Cir. 1972); *Citizens Nat'l Bank of Englewood v. Fort Lee Sav. & Loan Ass'n*, 89 N.J.Super. 43, 213 A.2d 315, 319 (Law Div.1965).

[¶ 22] Application of the "honesty in fact" standard to the Credit Union's conduct here demonstrates these principles at work. It is undisputed that the Credit Union had no knowledge that Richard obtained the Sun Life checks by fraud. Nor was the Credit Union aware that a stop payment order had been placed on the Sun Life checks. The Credit Union expeditiously gave value on the checks, having no knowledge that they would be dishonored. In essence the Credit Union acted as banks have, for years, been allowed to act without risk to holder in due course status. The Credit Union acted with honesty in fact.

 [¶ 23] Thus, had the matter at bar been decided before the Legislature's addition of the objective component of "good

---

17. Because we are required to interpret the current definition of "good faith" for purposes of holder in due course status—a definition which is not without ambiguity—we look to the history of the definition for guidance. "When the language of a statute is ambiguous, we 'look beyond the words of the statute to its history, the policy behind it, and other extrinsic aids to determine legislative intent.'" *Arsenault v. Crossman*, 1997 Me. 92, ¶7, 696 A.2d 418 (1997)(quoting *State v. Fournier*, 617 A.2d 998, 1000 (Me. 1992)); accord *Salenius v. Salenius*, 654 A.2d 426, 429 (Me. 1995).

18. *But see, e.g., Seinfeld*, 405 So.2d at 1042 n.4 (applying what many have viewed as an objective standard of good faith).

faith," there can be little question that the Credit Union would have been determined to have been a holder in due course. Because it took the instruments without notice of any possible dishonor, defect, fraud, or illegality, it could have given value immediately and yet have been assured of holder in due course status. *See Mellon Bank*, 29 UCC Rep.Serv. at 912; *Industrial Nat'l Bank of Rhode Island v. Leo's Used Car Exchange, Inc.*, 362 Mass. 797, 291 N.E.2d 603, 606 (1973); *New Bedford Inst.*, 634 N.E.2d at 925; *Triffin*, 716 A.2d at 611. Today, however, something more than mere subjective good faith is required of a holder in due course.

### 2. Reasonable Commercial Standards of Fair Dealing

[¶ 24] We turn then to the objective prong of the good faith analysis. The addition of the language requiring the holder to prove conduct meeting "reasonable commercial standards of fair dealing" signals a significant change in the definition of a holder in due course.[19] While there has been little time for the development of a body of law interpreting this new objective requirement, there can be no mistaking the fact that a holder may no longer act with a pure heart and an empty head and still obtain holder in due course status.[20] The pure heart of the holder must now be accompanied by reasoning that assures conduct comporting with reasonable commercial standards of fair dealing.

[¶ 25] The addition of the objective element represents not so much a new concept in the doctrinal development of holder in due course status, but rather a return, in part, to an earlier approach to the doctrine. *See* JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 14–6, at 62829 (3d ed.1988) (discussing the objective test of good faith in England, first applied by the King's Bench in *Gill v. Cubitt*, 3 B & C 466, 107 Eng.Rep. 806 (K.B.1824)). The concept of an objective component of good faith has been part of the discussion regarding the holder in due course doctrine since the first enactment of the U.C.C. *See id.* (noting that "[t]he good faith requirement has been the source of a continuing and ancient dispute"). The early drafters debated the need and wisdom of including such an objective component and ultimately determined *not* to include it in the definition of good faith because of its potential for freezing commercial practices. *See Sinclair, supra,* at 653–54 (noting, in particular, the objection by the banking industry to the addition of an objective good faith component). The "new" element of good faith requiring the holder to act according to reasonable commercial standards of fair dealing is actually a more narrow version of the "reasonable person" standard considered and rejected by the drafters o the 1962 Code.

[¶ 26] The new objective standard, however, is not a model of drafting clarity. Although use of the word "reasonable" in the objective portion of the good faith test may evoke concepts of negligence, the drafters attempted to distinguish the concept of "fair" dealing from concepts of "careful" dealing:

> Although fair dealing is a broad term that must be defined in context, it is clear that it is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction.

U.C.C. § 3–103 cmt. 4 (1991).

▮▮ [¶ 27] Unfortunately, the ease with which the distinction between "fair dealing" and "careful dealing" was set forth in the comments to the U.C.C. revisions belies the difficulty in applying these concepts to the facts of any particular case, or in conveying them to a jury. The difficulty is exacerbated

---

**19.** "The new definition of good faith *substantially affects*...the requirements for holder in due course status." Hawkland & Lawrence UCC Series § 3-103:05 (Rev Art 3)(emphasis added).

**20.** The objective requirement, however, has generated a number of articles and commentaries on the reason, meaning, and anticipated interpretations of the changes. *See, e.g.,* Patricia L. Heatherman, Comment, *Good Faith in Revised Article 3 of the Uniform Commercial Code: Any Change? Should There Be?* 29 WILLAMETTE L. REV. 567 (1993); Kerry Lynn Macintosh, *Liberty, Trade, and the Uniform Commercial Code, When Should Default Rules be Based on Business Practices?* 38 WM. & MARY L. REV 1465, 1466 (1997).

by the lack of definition of the term "fair dealing" in the U.C.C.[21] The most obvious question arising from the use of the term "fair" is: fairness to whom? Transactions involving negotiable instruments have traditionally required the detailed level of control and definition of roles set out in the U.C.C. precisely because there are so many parties who may be involved in a single transaction. If a holder is required to act "fairly," regarding all parties, it must engage in an almost impossible balancing of rights and interests. Accordingly, the drafters limited the requirement of fair dealing to conduct that is reasonable in the commercial context of the transaction at issue. In other words, the holder must act in a way that is fair according to commercial standards that are themselves reasonable.

[¶ 28] The factfinder must therefore determine, first, whether the conduct of the holder comported with industry or "commercial" standards applicable to the transaction and, second, whether those standards were reasonable standards intended to result in fair dealing. Each of those determinations must be made in the context of the specific transaction at hand. If the factfinder's conclusion on each point is "yes," the holder will be determined to have acted in good faith even if, in the individual transaction at issue, the result appears unreasonable. Thus a holder may be accorded holder in due course status where it acts pursuant to those reasonable commercial standards of fair dealing—even if it is negligent—but may lose that status, even where it complies with commercial standards, if those standards are not reasonably related to achieving fair dealing.

[¶ 29] Therefore the jury's task here was to decide whether the Credit Union observed the banking industries' commercial standards relating to the giving of value on uncollected funds, and, if so, whether those standards are reasonably designed to result in fair dealing.

[¶ 30] The evidence produced by the Credit Union in support of its position that it acted in accordance with objective good faith included the following: The Credit Union's internal policy was to make provisional credit available immediately upon the deposit of a check by one of its members. In certain circumstances—where the check was for a large amount and where it was drawn on an out-of-state bank—its policy allowed for a hold to be placed on the uncollected funds for up to nine days. The Credit Union's general written policy on this issue was reviewed annually—and had always been approved— by the National Credit Union Administration, the federal agency charged with the duty of regulating federal credit unions. *See* 12 U.S.C.A. § 1752a (Law.Co-op.1996). In addition, the policy complied with applicable banking laws, including Regulation CC. *See* 12 C.F.R. §§ 229.12(c), 229.13(b) (1998).

[¶ 31] The Credit Union also presented evidence that neither Regulation CC nor the Credit Union's internal policy *required* it to hold the checks or to investigate the genesis of checks before extending provisional credit. It asserted that it acted exactly as its policy and the law allowed when it immediately extended provisional credit on these checks, despite the fact that they were drawn for relatively large amounts on an out-of-state bank.[22] Finally, the Credit Union presented expert testimony that most credit unions in Maine follow similar policies.

[¶ 32] In urging the jury to find that the Credit Union had not acted in good faith, Sun Life and the Guerrettes argued that the Credit Union's conduct did not comport with reasonable commercial standards of fair dealing when it allowed its member access to provisional credit on checks totalling over $120,000 drawn on an out-of-state bank without either: (1) further investigation to assure that the deposited checks would be paid by the bank upon which they were drawn, or (2) holding the instruments to allow any irregularities to come to light.

---

21. One commentator has suggested that fair dealing refers to "playing by the rules." *See Heatherman, supra,* at 585. Yet "the rules" ordinarily define the parameters of reasonable conduct, a concept which sounds much like a negligence analysis.

22. The Credit Union could also have withheld provisional credit under the law and its own internal policy if there were other reasons to doubt the validity of the checks. *See* 12 C.F.R. § 229.13(e) (1998).

[¶ 33] The applicable federal regulations provide the outside limit on the Credit Union's ability to hold the checks. Although the limit on allowable holds established by law is evidence to be considered by the jury, it does not itself establish reasonable commercial standard of fair dealing. The factfinder must consider all of the facts relevant to the transaction. The amount of the checks and the location of the payor bank, however, are relevant facts that a bank, observing reasonable commercial standards of fair dealing, takes into account when deciding whether to place such a hold on the account. The jury was entitled to consider that, under Regulation CC, when a check in an amount greater than $5,000 is deposited, or when a check is payable by a nonlocal bank, a credit union is permitted to withhold provisional credit for longer periods of time than it is allowed in other circumstances. *See* 12 C.F.R. § 229.13(b), (h) (1998). Therefore, the size of the check and the location of the payor bank are, under the objective standard of good faith, factors which a jury may also consider when deciding whether a depositary bank is a holder in due course.

[¶ 34] The Credit Union's President admitted the risks inherent in the Credit Union's policy and admitted that it would not have been difficult to place a hold on these funds for the few days that it would normally take for the payor bank to pay the checks. He conceded that the amount of the checks were relatively large, that they were drawn on an out-of-state bank, and that these circumstances "could have" presented the Credit Union with cause to place a hold on the account. He also testified to his understanding that some commercial banks followed a policy of holding nonlocal checks for three business days before giving provisional credit.[23] Moreover, the Credit Union had no written policy explicitly guiding its staff regarding the placing of a hold on uncollected funds. Rather, the decision on whether to place a temporary hold on an account was left to the "comfort level" of the teller accepting the deposit. There was no dispute that the amount of the three checks far exceeded the $5,000 threshold for a discretionary hold established by the Credit Union's own policy.

[¶ 35] On these facts the jury could rationally have concluded that the reasonable commercial standard of fair dealing would require the placing of a hold on the uncollected funds for a reasonable period of time and that, in giving value under these circumstances, the Credit Union did not act according to commercial standards that were reasonably structured to result in fair dealing.

[¶ 36] We recognize that the Legislature's addition of an objective standard of conduct in this area of law may well have the effect of slowing the "wheels of commerce."[24] As one commentator noted:

> Historically, it was always argued that if negotiable instruments were to be usefully negotiable a subsequent holder should not have to investigate the transaction giving rise to the paper. The paramount necessity of negotiability has dominated thinking and legislation on negotiable instruments law. Drafts and promissory notes, it has been believed, must be able to change hands freely, without investigation beyond the face of the instrument, and with no greater requirement than the indorsement of the holder.

*Sinclair, supra,* at 630 (footnotes omitted). Notwithstanding society's oftcited need for certainty and speed in commercial transactions, however, the Legislature necessarily must have concluded that the addition of the objective requirement to the definition of "good faith" serves an important goal. The paramount necessity of unquestioned negotiability has given way, at least in part, to the desire for reasonable commercial fairness in negotiable transactions.

---

23. There was evidence that, on the second business day after he deposited the checks, Paul Richard notified the Credit Union that there may have been a problem with his deposit.

24. The new definition of "good faith" has been forecasted by some to bring possible "undesirable changes" to the law of negotiable instruments. *See* Henry J. Bailey, *New 1990 Uniform Commercial Code: Article 3, Negotiable Instruments, and Article 4, Bank Deposits and Collections,* 29 WILLAMETTE L. REV. 409, 415 (1993).

## IV. Effect of Fraud Defense

### A. The Guerrettes

[¶ 37] Having failed to persuade the jury that it was a holder in due course, the Credit Union is subject to any defense of the Guerrettes or Sun Life "that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract," 11 M.R.S.A. § 3–1305(1)(b), or any "claim of a property or possessory right in the instrument or its proceeds." 11 M.R.S.A. § 3–1306. Generally, fraud, such as that perpetrated by Paul Richard and Steven Hall, may be the basis for both a valid defense, *see Silber v. Muschel*, 190 A.D.2d 727, 593 N.Y.S.2d 306, 307 (1993), and a valid claim to the instrument itself. *See generally Bowling Green, Inc. v. State St. Bank & Trust Co.*, 307 F.Supp. 648, 651–52 (D.Mass.1969), *aff'd*, 425 F.2d 81 (1st Cir.1970).

[¶ 38] Fraud is an affirmative defense to a contract. *See* M.R. Civ. P. 8(c). To prevail on their fraud defense, the Guerrettes were required to prove, by clear and convincing evidence, that a fraudulent or material misrepresentation induced them to transfer the proceeds of their father's life insurance policy, in the form of the Sun Life checks, to Steven Hall and Paul Richard. In addition, they were required to prove they were justified in relying on the fraudulent misrepresentation. *See Kuperman v. Eiras*, 586 A.2d 1260, 1261 (Me.1991). The parties' stipulation that Hall and Richard fraudulently induced the Guerrettes to invest the checks in their company, HER, Inc., is sufficient to satisfy the Guerrettes' burden on this issue. The Guerrettes are not liable to the Credit Union for their indorsement of the Sun Life checks.

### B. Sun Life

[¶ 39] Sun Life, however, may not raise the fraud as a defense to its liability on the instrument. Section 3–1305(3) provides generally that:

in an action to enforce the obligation of a party to pay [an] instrument, the obligor may not assert against the person entitled to enforce the instrument a defense, claim in recoupment or claim to the instrument (section 3–1306) of another person.

11 M.R.S.A. § 3–1305(3). Accordingly, a defense to liability on an instrument—such as fraud in the underlying transaction—raised by one party to an action may not be raised by another party to the action as its own defense to liability. Section 3–1305(3) provides, however, that "the other person's claim to the instrument may be asserted by the obligor if the other person is joined in the action and personally asserts the claim against the person entitled to enforce the instrument." *Id.* Therefore, only if the Guerrettes have made a claim to the instrument and are parties to the proceeding may Sun Life assert the fraud in defense of its own liability. *See* 11 M.R.S.A. 3–1305(3); *First Nat'l Bank of Nocona v. Duncan Sav. & Loan Ass'n*, 656 F.Supp. 358, 366 (W.D.Okla. 1987), *aff'd*, 957 F.2d 775 (10th Cir.1992).

[¶ 40] The Guerrettes, however, made no claim that they were entitled to possession of the instruments held by the Credit Union.[25] Instead, they merely argued that they were not liable as indorsers of the checks held by the Credit Union as a result of the fraud. The issue of fraud was therefore raised by the Guerrettes as a *defense* to their liability as indorsers of the instruments. *See Louis Falcigno Enters., Inc. v. Massachusetts Bank & Trust Co.*, 14 Mass.App.Ct. 92, 436 N.E.2d 993, 993–94 (1982). The Superior Court erred when it held that the issue of fraud had been raised as a "claim to the instruments."

[¶ 41] Therefore, Sun Life may not raise the fraud against the Guerettes as a defense to its own liability. Because Sun Life raises no other relevant defenses, it is liable to the Credit Union as the drawer of the instruments, *see* 11 M.R.S.A. § 3–1414(2)(a), and we vacate that portion of the Superior Court's judgment finding that Sun Life was not liable to the Credit Union.

---

**25.** The Guerrettes were issued new checks for the same amounts by Sun Life after Sun Life stopped payment on the original instruments.

The entry is

Judgment in favor of Daniel, Joel, and Claire Guerrette and against Maine Family Federal Credit Union affirmed.

Judgment in favor of Sun Life Assurance Company of Canada and against Maine Family Federal Credit Union vacated and remanded for further proceedings consistent with the opinion herein.

