A09A1562. CONSUMER SOLUTIONS FINANCIAL SERVICES, INC. v. HERITAGE BANK.
(684 SE2d 682)

BERNES, Judge.

Heritage Bank sued Consumer Solutions Financial Services, Inc. after two Consumer Solutions checks were deposited into the account of a Heritage customer and then were dishonored by the drawee bank. The trial court granted summary judgment to Heritage on its claims with respect to one of the checks for enforcement of drawer and signer obligations under Article 3 of the Georgia Uniform Commercial Code (the "UCC"), OCGA § 11-3-414 (b), and for violation of the "bad check" statute, OCGA § 13-6-15. Consumer Solutions appeals, and we affirm for the reasons set forth below.

To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law. OCGA § 9-11-56 (c); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant. *Supchak v. Pruitt*, 232 Ga. App. 680, 682 (1) (503 SE2d 581) (1998).

So viewed, the evidence showed that Consumer Solutions sold used automobiles to the public, specializing in high-end brands. Consumer Solutions purchased automobiles, individually and in lots, from Auto Haus Atlanta, LLC for resale.

This case centers on two checks, numbered 1006 and 1007, respectively, that were written by Consumer Solutions to Auto Haus.

---

[13] *Mountain Bound v. Alliant Foodservice*, 242 Ga. App. 557, 559 (3) (530 SE2d 272) (2000).

Auto Haus indorsed and deposited Check 1006 into its business checking account with Heritage on or about February 13, 2008. Check 1006 was made payable to Auto Haus in the amount of $608,150 and was drawn on Consumer Solutions's banking account with Bank of America. Check 1006 was signed by Terri Cavaness, an authorized representative of Consumer Solutions.

Auto Haus indorsed and deposited Check 1007 into the same business checking account the following day. Check 1007 was payable to Auto Haus in the amount of $661,002 and also was drawn on Consumer Solutions's account with Bank of America. Check 1007 was signed by Elgin Bennett, co-owner of Consumer Solutions.

At the time Check 1006 and Check 1007 were deposited, or shortly thereafter, Heritage credited Auto Haus's business checking account in amounts equal to that shown on the two checks. Auto Haus then made withdrawals against the increased balance in its account.

Heritage subsequently presented Check 1006 and Check 1007 for payment through a check clearinghouse. Bank of America dishonored Check 1006 on February 19, 2008, and dishonored Check 1007 the following day. The dishonoring of the two checks, combined with smaller credits and debits, caused Auto Haus's business checking account to become overdrawn by $916,831.24. Heritage demanded the amount of the dishonored checks from Consumer Solutions, which failed to respond. This lawsuit followed in which Heritage asserted claims against Consumer Solutions for breach of contract; fraud; negligent misrepresentation; breach of loan agreement; enforcement of UCC drawer and signer obligations under OCGA § 11-3-414 (b); violation of the bad check statute, OCGA § 13-6-15; and attorney fees.

Heritage moved for partial summary judgment on its claims for enforcement of drawer and signer obligations under the UCC and for violation of the bad check statute. The trial court granted the motion as to Check 1006 and denied it as to Check 1007, and then entered a partial final judgment against Consumer Solutions.

1. Consumer Solutions contends that the trial court erred in granting Heritage's motion for partial summary judgment because a genuine issue of material fact remained as to whether Consumer Solutions was the drawer or signer of Check 1006. We disagree.

OCGA § 11-3-414 (b), which sets forth certain drawer and signer obligations under the UCC, provides:

> If an unaccepted draft is dishonored, the drawer is obliged to pay the draft (i) according to its terms at the time it was issued or, if the instrument was not issued, at the time it first came into possession of a holder; or (ii) if the drawer

signed an incomplete instrument, according to the instrument's terms when completed, to the extent stated in Code Sections 11-3-115 and 11-3-407. The obligation is owed to a person entitled to enforce the draft or to an indorser who paid the draft under Code Section 11-3-415.

In turn, the bad check statute, OCGA § 13-6-15 (a), provides in relevant part:

Notwithstanding any criminal sanctions which may apply, any person who makes, utters, draws, or delivers any check, draft, or order upon any bank, depository, person, firm, or corporation for the payment of money, which drawee refuses to honor the instrument for lack of funds or credit in the account from which to pay the instrument or because the maker has no account with the drawee, and who fails to pay the same amount in cash to the payee named in the instrument within ten days after a written demand therefor, as provided in subsection (c) of this Code section, has been delivered to the maker by certified mail, or statutory overnight delivery shall be liable to the payee, in addition to the amount owing upon such check, draft, or order, for damages of double the amount so owing, but in no case more than $500.00, and any court costs incurred by the payee in taking the action.

The uncontroverted evidence of record shows that Consumer Solutions was the drawer and signer of Check 1006 for purposes of the UCC and bad check statute. Under the UCC, a "drawer" is "a person who signs or is identified in a draft as a person ordering payment." OCGA § 11-3-103 (a) (3). Under the bad check statute, liability extends to "any person who . . . draws" the dishonored check, if the other requirements of the statute are satisfied. See OCGA § 13-6-15 (a).

Consumer Solutions admitted in its answer that Check 1006 "was signed by Terri Cavaness as an authorized representative of Consumer Solutions."[1] Since Cavaness signed in that capacity, the UCC provides that

the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract. If the represented

---

[1] Consumer Solutions also confirmed in its appellate brief that "[i]t is undisputed that [C]heck 1006 was . . . signed by Terry Cavanass, a [Consumer Solutions] employee."

> person is bound, the signature of the representative is the "authorized signature of the represented person" and the represented person is liable on the instrument.

OCGA § 11-3-402 (a). This principle also applies to the bad check claim. See *Peterson v. Holtrachem, Inc.*, 239 Ga. App. 838, 840, n. 3 (521 SE2d 648) (1999) (OCGA § 13-6-15 should be construed in pari materia with OCGA § 11-3-402). It follows that because Consumer Solutions admitted that Cavaness was the actual signatory of Check 1006 and that she possessed representative authority to sign checks on its behalf, there was no genuine issue of material fact as to whether Consumer Solutions was the drawer and signer of that instrument.

Consumer Solutions contends, however, that Cavaness was induced to sign Check 1006 through the fraudulent means of Christopher M. Hill, a principal of Auto Haus. See OCGA §§ 11-3-305 (a) (1) (iii) (the right to enforce an obligation is subject to the obligor's defense that fraud induced the obligor to sign the instrument without knowledge or reasonable opportunity to learn of its terms); 11-3-305 (a) (2) (obligor may raise any defense that would be available if person seeking to enforce the instrument were seeking to enforce a simple contract); 13-6-15 (e) (the specified affirmative defenses are "in addition to other defenses"). To support this contention, Consumer Solutions relies upon the affidavit of its co-owner, Elgin Bennett, and a notarized letter written by Hill. Neither the affidavit nor the letter, however, establishes Consumer Solutions's contention.

According to the affidavit of Bennett, "Check number 1006 and check number 1007 were drawn through the fraudulent means of . . . Hill." But the assertion that checks were issued through "fraudulent means" is simply a legal conclusion and of no probative value. "[W]here an affidavit contains conclusions which would not be admissible in evidence, the conclusions are to be disregarded in considering the affidavit in connection with the motion for summary judgment." *Love v. Love*, 259 Ga. 423, 424 (1) (383 SE2d 329) (1989). Nor does Bennett's affidavit otherwise contain specific facts which show that Hill either signed Check 1006 without authority or fraudulently procured the issuance of Check 1006.

As for Hill's letter, it is true that it contains Hill's signature and an additional signature with an adjacent notary seal, and thus appears to have been notarized. Significantly, however, there is no indication either in the body of the letter or before the notary's signature that Hill swore to the contents of the letter. See *Hughes v. Dulock*, 207 Ga. App. 492, 493 (1) (428 SE2d 406) (1993) (concluding that the document, although signed and notarized, did not contain a

sworn admission of fact). Thus, Hill's letter was not an "affidavit" for purposes of summary judgment. "[A]n affidavit must be sworn to in person before a notary public or other officer empowered to administer oaths." *Keane v. Annice Heygood Trevitt Support Trust*, 285 Ga. App. 155, 157 (645 SE2d 641) (2007). See OCGA § 9-11-56 (e). "The contents of the letter therefore amount to no more than factual allegations additional to those in the pleadings." *Barber v. Threlkeld Ford*, 199 Ga. App. 787, 788 (406 SE2d 249) (1991). Furthermore, even if Hill's letter could be viewed as a competent affidavit for purposes of summary judgment, the only check he specifically addresses is Check 1007, and Consumer Solutions does not dispute that Cavaness signed Check 1006 or disclose any facts that show or create a reasonable inference that she was fraudulently induced to sign Check 1006.

For these reasons, there was no genuine issue of material fact over whether Consumer Solutions was the drawer and signer of Check 1006 for purposes of the UCC and the bad check statute. The trial court did not err in granting partial summary judgment to Heritage on this issue.

2. Consumer Solutions also contends that a genuine issue of material fact remains as to whether Heritage was a holder in due course of Check 1006 that could enforce the drawer and signer obligations imposed by the UCC, OCGA § 11-3-414 (b). We conclude that even if Heritage was not a holder in due course of Check 1006, it was entitled to summary judgment on its UCC claim under the facts of this case.

Heritage was entitled to enforce the drawer and signer obligations imposed upon Consumer Solutions because it was the "holder" of Check 1006 as that term is used in OCGA § 11-3-414 (b). It is undisputed that Check 1006 was indorsed in blank by Auto Haus and was submitted to Heritage for deposit.[2] Since Heritage was the depository bank and it is also undisputed that the amount of the check was deposited to its customer's account, Heritage became the holder of the instrument when it received the check for collec-

---

[2] OCGA § 11-3-205 provides in part:

(a) If an indorsement is made by the holder of an instrument, whether payable to an identified person or payable to bearer, and the indorsement identifies a person to whom it makes the instrument payable, it is a "special indorsement." When specially indorsed, an instrument becomes payable to the identified person and may be negotiated only by the indorsement of that person. The principles stated in Code Section 11-3-110 apply to special indorsements.

(b) If an indorsement is made by the holder of an instrument and it is not a special indorsement, it is a "blank indorsement." When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed.

. . .

tion.[3] See OCGA § 11-4-205; *Maine Family Fed. Credit Union v. Sun Life Assurance Co. &c.*, 727 A2d 335, 338-339 (II) (Me. 1999). Notably, "the holder of the instrument" is included within the definition of a "[p]erson entitled to enforce" the drawer and signer obligations imposed by OCGA § 11-3-414 (b). See OCGA § 11-3-301.

By establishing that it was the holder of Check 1006, Heritage made a prima facie showing that it could enforce the drawer and signer obligations imposed upon Consumer Solutions. Nevertheless, "the right to enforce the obligation of a party to pay an instrument" is subject to defenses. OCGA § 11-3-305 (a). If Heritage were not merely a holder, but also a "holder in due course,"[4] then it would be shielded from certain defenses that Consumer Solutions potentially could assert against Heritage. See OCGA § 11-3-305 (b). But Consumer Solutions failed to come forward with any admissible, competent evidence to support any such defenses with respect to Check 1006. Hence, Heritage did not need to show that it was also a holder in due course in order to establish its right to recover. See generally *Maine Family Fed. Credit Union*, 727 A2d at 345 (IV) (B) (the drawer was liable to the depository bank, which was a holder of the instrument but not a holder in due course). It follows that we need not determine whether genuine issues of material fact remain as to Heritage's status as a holder in due course of Check 1006.

*Judgment affirmed. Smith, P. J., and Phipps, J., concur.*

---

[3] The depository bank becomes a holder "if the customer at the time of delivery was a holder of the item" and "[t]he depositary bank warrants . . . that the amount of the item was paid to the customer or deposited to the customer's account." OCGA § 11-4-205 (1), (2). Check 1006 was indorsed in blank by the payee, Auto Haus, and so Heritage received the instrument from a holder. See *Gerber & Gerber, P.C. v. Regions Bank*, 266 Ga. App. 8, 10 (1) (596 SE2d 174) (2004). Heritage then deposited the amount of the check to Auto Haus's account.

[4] OCGA § 11-3-302 provides in relevant part:

(a) Subject to subsection (c) of this Code section and subsection (d) of Code Section 11-3-106, "holder in due course" means the holder of an instrument if:

(1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) The holder took the instrument:

(i) For value;

(ii) In good faith;

(iii) Without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series;

(iv) Without notice that the instrument contains an unauthorized signature or has been altered;

(v) Without notice of any claim to the instrument described in Code Section 11-3-306; and

(vi) Without notice that any party has a defense or claim in recoupment described in subsection (a) of Code Section 11-3-305.

DECIDED SEPTEMBER 30, 2009.

*Brown & Gill, Angela B. Dillon, Max C. Richardson, Jr.*, for appellant.

*Bryan, Cave, Powell & Goldstein, William B. Brockman*, for appellee.